**The STATE of Texas, Appellant,**

v.

**PR INVESTMENTS and Specialty Retailers, Inc., Appellees.**

**No. 14–00–00091–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 26, 2004.

---

Gregory S. Coleman, Ryan David Clinton, Austin, for appellant.

Billy C. Dyer, H. Dixon Montague, W. Allyn Hoaglund, Houston, for appellees.

Panel consists of Chief Justice HEDGES and Justices ANDERSON and SEYMORE.

## OPINION

JOHN S. ANDERSON, Justice.

In this eminent domain case, the State of Texas appeals from a judgment in which the trial court (1) dismissed the State's

petition for condemnation without prejudice and (2) awarded appellees PR Investments (PRI) and Specialty Retailers, Inc., their attorneys' fees and expenses incurred defending against the condemnation. We hold, under the eminent domain procedures set forth in the Texas Property Code chapter 21, the trial court (a) lacked jurisdiction to consider a condemnation plan not presented to the special commissioners, (b) correctly dismissed the case without prejudice, and (c) correctly awarded attorneys' fees and expenses under Texas Property Code section 21.095(c).[1] Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

As part of a project by the Texas Department of Transportation (TxDOT) to convert Highway 90–A (South Main Street) into a controlled access highway, the State sought to acquire .3407 acres of a twenty-three-acre tract of land owned by PRI and abutting South Main Street. Specialty Retailers occupied and leased a multi-story office complex and distribution facility at the back of PRI's property and also owned an easement interest in a driveway that provided the only ingress and egress between the distribution facility and South Main Street. Before the project, PRI's property had approximately 788 feet of frontage on, and had direct access to, the northbound lanes of South Main Street. A cut was made in the esplanade of South Main Street to accommodate a dedicated left turn lane providing direct access to the driveway for all southbound traffic, and a traffic light provided signal-controlled protection for vehicles entering

and exiting the driveway from all directions. When the project is completed, the remainder property will no longer have direct access to the main lanes of South Main Street, but will abut a high-volume, multiple-lane, north-bound access road.

In 1997, the State and PRI began negotiating the design of the access lanes abutting the remainder property. The resulting proposed plan, subsequently designated the "Sparks and Barlow plan," was a compromise between the State's original schematic plan and the design features PRI requested.[2] The Sparks and Barlow plan called for the outside lane of the access road to be striped, with jiggle bars added, to produce a de-facto single deceleration/acceleration lane. To the south of the driveway, the lane would be striped and signs added to show a right-turn only, so the lane would be used exclusively for deceleration and access to the PRI driveway; to the north, the lane would be striped to minimize weaving movement on the approach to the South Main/Interstate 610 interchange, thereby protecting vehicles turning out of the driveway onto the access road. In addition, the plans called for a raised concrete island to provide additional protection for those entering and exiting the driveway.

In November 1997, the State filed its Original Petition for Condemnation. The petition contained no reference to the construction plan. In February 1998, Gabriel Johnson, Director of Transportation, Planning, and Development for the TxDOT Houston District, wrote PRI's agent, confirming construction would proceed according to the Sparks and Barlow plan.

1. TEX. PROP.CODE ANN. § 21.095(c) (Vernon 2004).

2. The State refers to the Sparks and Barlow plan as the "accommodation plan." Appellees refer to it as the "original plan." Although the Sparks and Barlow plan was not sealed until May 27, 1998, we refer to the negotiated plan as the Sparks and Barlow plan in order to avoid confusion that use of other terms might engender.

On May 6, 1998, the court-appointed special commissioners convened to determine the amount of compensation to which PRI and Specialty Retailers were entitled. At that hearing, the State's engineer, Stuart Corder, established the deceleration and acceleration lanes would be built according to the Sparks and Barlow plan. Although PRI conceded the plan would provide suitable access to the existing driveway, PRI presented evidence regarding its inability to construct additional driveways from the remainder property. The special commissioners awarded a total of $166,000.00 jointly to PRI, Specialty Retailers, and a third party not involved in the present appeal.

Both the State and PRI filed objections to the award. Satisfied with the Sparks and Barlow plan, Specialty Retailers did not participate in the commissioners' hearing or file an objection to the award.

In May 1998, the court set the case for trial to begin the week of April 5, 1999. On February 16, 1999, the State filed an unopposed motion for continuance, based on the need for more discovery and time to prepare its case. The trial court granted the State's motion and reset the case for the week of December 6, 1999. The trial court also set a December 3, 1999 deadline for any motion for continuance. On September 23, 1999, the trial court granted the State's request for a docket control order, setting the following deadlines: all written expert reports to be exchanged by October 20, 1999; all discovery, including depositions, to be completed and all pleadings to be amended by November 20, 1999.

After the special commissioners' hearing and throughout the discovery period, all parties and their experts relied on the Sparks and Barlow plan to determine whether the project substantially impaired access to the remainder property and, if so, the extent of damages so caused. On March 31, 1999, Charles Gaskin, Director of Construction for the TxDOT Houston District, wrote Specialty Retailers promising, per the Sparks and Barlow plan, that there would be a lane for acceleration and deceleration at the driveway entrance. During the discovery period, the parties deposed at least twelve expert witnesses, all of whom relied on the Sparks and Barlow plan in forming their opinions. In response to PRI's request for disclosure, interrogatories, and requests for production of documents, the State represented the project would be constructed according to the Sparks and Barlow plan.

Sometime after June, 1999, a new assistant attorney general became involved in the case.[3] It was his "view from a litigation prospective [sic] that the signing and the striping of the road should go back to the original design," a plan subsequently designated the "Corder plan."[4] The Corder plan eliminated the dedicated acceleration and deceleration lanes and the traffic island.

On November 12, 1999, following a failed mediation, various TxDOT supervisory managers, including Johnson and Corder, met to consider the Corder plan as an alternative to the Sparks and Barlow plan. Corder left the meeting with the understanding everyone, including Johnson, agreed to proceed under the Sparks and Barlow plan. However, shortly after Johnson's deposition on November 16,

---

3. In December 1999, the attorney testified he had been with the Attorney General's office for "approximately six months." PRI represents, without record citation, the attorney became involved in early October 1999.

4. The State refers to the Corder plan as the "original plan." Appellees refer to it as the "new plan." To avoid confusion, we refer to it simply as the "Corder plan."

1999, Johnson had a discussion with the assistant attorney general and, according to Johnson, "After our discussion ... we felt comfortable" proceeding with the Corder plan. Prior to November 25, 1999, TxDOT decided to proceed under the Corder plan.[5] On Johnson's return from vacation and before December 1, 1999, Johnson gave the Corder plan his approval; and on December 1, 1999, Corder sealed the plan.

The same day, Johnson called the assistant attorney general and informed him of the change. The assistant attorney general then called PRI's attorney advising him of the change in plans. He sent a copy of the Corder plan by facsimile that day and the following day sent a full size copy, which PRI's attorney received December 3, 1999. The assistant attorney general did not notify Specialty Retailers of the change. He admitted this was an "oversight."

On December 7, 1999, the case was called to trial, and the State, PRI, and Specialty Retailers appeared and announced ready. The court began by considering the State's Motion for Leave to File First Amended Petition for Condemnation, which the State had filed December 2, 1999. Like the Original Petition, the First Amended Petition contained no reference to the construction plan. The purpose of the amendment was to correct the point of commencement in the property description, but the size and location of the taking were not changed from the description attached to the original petition. Accordingly, the motion contained a paragraph stating in part: "Descriptions of the

parcel's size, configuration, and location remain unchanged. The interest acquired remains fee simple title. There is no change in the status of the parcel that would work any harm or inconvenience or serve as a surprise to Defendants."

PRI objected to the motion, asserting the last quoted sentence was untrue because TxDOT had changed the signing and striping plan after the discovery cutoff and had harmed appellees. The trial court regarded the change in the commencement point as a separate matter from the change in construction plan, and granted the State's Motion for Leave to Amend.

PRI and Specialty Retailers then made an oral motion to strike the Amended Petition. They asserted multiple grounds related to the change in construction plans: (1) the State changed the plan after the discovery cutoff; (2) the Corder plan had not been before the special commissioners and had not been considered by PRI's experts; (3) the Corder plan significantly increased the burden on the remainder property by eliminating the acceleration and deceleration lanes; (4) Specialty Retailers did not participate in the special commissioners' hearing based on the State's representation the State would follow the Sparks and Barlow plan; and (5) the State did not notify Specialty Retailers of the change in plans.

The State responded appellees were not prejudiced because the plan did not create a substantial and material impairment of access, and, therefore, denial of access was not compensable. The State also objected

---

**5.** The trial court found that "[p]rior to November 25, 1999, the State decided to materially change the Original Construction Plan." November 25, 1999, was Thanksgiving. Johnson was out of the country on vacation Thanksgiving week. Francis Willison, Director of District Right of Way, testified the

decision was made sometime before Thanksgiving of 1999. When confronted with this testimony, Johnson responded that the "final decision was basically [made] right after [he] came back from vacation" because until he came back from vacation, no "final" decision was made.

to the "fiction" of trying the case on the Sparks and Barlow plan.

The trial court concluded it had to decide the access issue before deciding appellees' motion to strike. The court then heard evidence on the access issue for the remainder of the day.

The following day, the court again heard arguments on appellees' motion. In the course of the arguments, the State suggested "do[ing] a Motion for Continuance." The court indicated it would grant one if appellees agreed. PRI argued a continuance was unacceptable because PRI had based its one opportunity to be heard by the special commissioners on the Sparks and Barlow plan, and the State had presented the special commissioners with a plan they were not going to build.

The trial court then inquired whether the case could be remanded to the special commissioners. The State responded that was a possible solution and requested an opportunity to brief the issue. PRI argued it was not possible to remand to the special commissioners because they had disbanded; if the State wanted to construct the Corder plan, it should dismiss the case. The trial court then ruled it would exclude evidence of the Corder plan and advised the State it could either dismiss the case and start over or proceed with the Sparks and Barlow plan. The State responded it wished to proceed to trial on the Corder Plan. Given the trial court's earlier evidentiary ruling, PRI announced it was withdrawing its motion to dismiss and would move for judgment on the Sparks and Barlow plan at the conclusion of trial. The State objected to proceeding to trial on the Sparks and Barlow plan, stating it would be "error for [the] Court to proceed to have the jury make findings as to compensation based on a

fiction." The State again moved for a continuance "of no less than 60 days," and the court denied the motion.

Because TxDOT did not intend to implement the Sparks and Barlow plan, PRI next objected to proceeding to trial on that plan and moved for sanctions against the State under Texas Civil Procedure Rule 13. Before ruling on PRI's motion, the trial court asked the State whether it still wished to proceed on the Corder plan. The State responded it intended to "proceed in protest" on the Sparks and Barlow plan. Specialty Retailers then moved for dismissal under Rule 13, and PRI reurged a motion to dismiss with its Rule 13 motion. The trial court granted appellees' motions, dismissed the State's case without prejudice, and directed the parties to appear the following day to present evidence on appellees' expenses.

The following day, the State (1) reurged its earlier motion for continuance, (2) objected to imposition of sanctions on several grounds, including the court's not having made the necessary "findings" under *TransAmerican Natural Gas Corp. v. Powell*,[6] and (3) requested a continuance of the hearing on appellees' attorneys' fees and expenses. The trial court denied the requested relief.

Before putting on evidence, PRI advised the court it was "not asking for the State to be fined or penalized in any way." Instead, it was asking only for compensation as provided by the Property Code on dismissal of a condemnation proceeding. Appellees then presented evidence of their attorneys' fees and expenses. Although the State cross-examined appellees' witnesses, it did not present controverting evidence.

The trial court entered written judgment dismissing the State's action without

6. 811 S.W.2d 913 (Tex.1991) (orig. proceed-    ing).

prejudice and awarding attorneys' fees and expenses "pursuant to the Texas Rules of Civil Procedure, including Rules 13 and 215, the Texas Property Code, including § 21.0195, and the inherent powers of the Court, and to the extent 'the State' as a party in this case is considered to be an 'Agency of the State,' pursuant to Chapter 105 of the Texas Civil Practice and Remedies Code." The court ordered the State to pay $555,651.47 and $95,000.00 in attorneys' fees and expenses to PRI and Specialty Retailers, respectively.

## DISCUSSION

### *Introduction*

The State raises two issues on appeal: (1) whether the trial court erred in dismissing the case for lack of "subject matter jurisdiction and as a sanction against the State," and (2) whether the trial court erred in ordering the State to pay all of appellees' attorneys' fees and expenses because the case was dismissed. In its discussion of these issues, the State sets forth six arguments. In its first argument, the State contends the trial court erred in deciding it lacked subject matter jurisdiction because the State allegedly failed to comply strictly with the Texas Property Code's eminent domain procedures. In its second through fifth arguments, respectively, the State challenges the trial courts imposition of sanctions under (a) Texas Rule of Civil Procedure 13, (b) Texas Rule of Civil Procedure 215, (c) the Frivolous Claims Act,[7] and (d) its inherent powers. In its sixth argument the State contends the trial court erred in awarding excessive fees and expenses against the State under the Texas Property Code. Concluding the trial court correctly dismissed the case and awarded fees and expenses under the emi-

nent domain procedures of the Texas Property Code, we do not address whether dismissal and the award of fees and expenses were properly imposed as a sanction against the State.

### *I. Did the Trial Court Err in Dismissing the Case because it Concluded it Lacked Jurisdiction to Proceed?*

In its first argument, the State contends the trial court erred as a matter of law in deciding it lacked "subject matter jurisdiction" because the State allegedly failed to comply strictly with the eminent domain procedures of the Texas Property Code. The State further argues this court should apply the holding in *Dubai Petroleum v. Kazi*,[8] a statutory wrongful death case, to eminent domain proceedings, and hold that failure to present the Corder plan to the special commissioners did not deprive the trial court of subject matter jurisdiction, thus allowing the trial court to "remand" the case to the special commissioners for consideration of that plan. Appellees respond the trial court correctly determined the State's failure to comply with the statutory condemnation procedures deprived the trial court of its "appellate jurisdiction" and *Dubai* is inapposite.

The judgment does not refer to "subject matter jurisdiction" or to "appellate jurisdiction." The judgment states in relevant part:

> (9) The Court lacked jurisdiction to proceed to trial on the New [Corder] Construction Plan since it was reasonable to conclude from the evidence and representations of counsel that the New Construction Plan deprived the Property Owners of greater rights and imposed greater burdens on the remainder prop-

---

7. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 105.001–.004 (Vernon 1997).

8. 12 S.W.3d 71 (Tex.2000).

erty than did the Original [Sparks and Barlow] Construction Plan.

(10) The State failed to comply strictly with the Texas Property Code. When it abandoned the Original Construction Plan after the Special Commissioners' hearing and admitted that the Highway Project will not be constructed pursuant to the New Construction Plan, the State deprived the Property Owners of a meaningful administrative hearing before the Special Commissioners.

. . .

(17) Good cause exits for the dismissal of the State's condemnation action and the award of attorneys' fees and expenses to the Property Owners pursuant to the Texas Rules of Civil Procedure, including Rules 13 and 215, the Texas Property Code, including § 21.0195, and the inherent powers of the Court, and to the extent "the State" as a party in this case is considered to be an "Agency of the State", pursuant to Chapter 105 of the Texas Civil Practice and Remedies Code.

Given the nature of eminent domain proceedings, as discussed below, we conclude, under the circumstances of the present case, the trial court was referring to its "appellate jurisdiction," or, stated differently, to its "power" to proceed. We further conclude the trial court lacked jurisdiction, or the power to proceed, on a condemnation plan different from the one presented to the special commissioners.

■ Proceedings to condemn private land for public use are special in character, and a party attempting to establish its right to condemn must show strict compliance with Texas Property Code chapter 21. *State v. Bristol Hotel Asset Co.*, 65 S.W.3d 638, 640 (Tex.2002); *Metro. Transit Auth. Harris County, Texas v. Graham*, 105 S.W.3d 754, 757 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). The

condemnation procedures give a landowner only one opportunity to recover damages arising from the State's taking of his property. *John v. State*, 826 S.W.2d 138, 140 (Tex.1992). Accordingly, the protections of the condemnation statutes are to be liberally construed for the benefit of the landowner. *Id.* at 140.

■ Under chapter 21, condemnation proceedings have two distinct phases: (1) an initial administrative phase involving a hearing on damages before three commissioners appointed by the trial court; and, (2) if any party files and serves objections to the commissioners' award, a judicial proceeding in the trial court. *See Graham*, 105 S.W.3d at 757 (citing TEX. PROP. CODE ANN. §§ 21.014, .015, .018 (Vernon 1984)); *see also Amason v. Natural Gas Pipeline Co.*, 682 S.W.2d 240, 241–42 (Tex. 1984). If no party timely files objections, the trial court can perform only its ministerial function and render judgment based upon the commissioner's award. *John v. State*, 826 S.W.2d 138, 141 n. 5 (Tex.1992).

■ The first phase is initiated when the condemnor files, in the proper court, a petition, which must "(1) describe the property to be condemned; (2) state the purpose for which the entity intends to use the property; (3) state the name of the owner of the property if the owner is known; and (4) state that the entity and the property owner are unable to agree on the damages." TEX. PROP.CODE ANN. § 21.012(b) (Vernon 2004). By virtue of a condemnor's filing a petition reflecting the requirements of the statute, the trial court acquires jurisdiction over the subject matter. *Aquila Southwest Pipeline Corp. v. Gupton*, 886 S.W.2d 497, 501 (Tex.App.-Houston [1st Dist.] 1994, no writ) (citing *State v. Nelson*, 160 Tex. 515, 334 S.W.2d 788, 790 (1960)); *see also Lin v. Houston Cmty. Coll. Sys.*, 948 S.W.2d 328, 332 (Tex.

App.-Amarillo 1997, writ denied) (citing *Nelson,* 334 S.W.2d at 790, and stating, "It is well established that jurisdiction of a condemnation proceeding does not attach unless the condemnation petition includes a legally sufficient description of the property sought to be condemned."). Courts have also held that "[t]he condemnor's duty to engage in good faith negotiations to acquire the property is a jurisdictional requirement to filing suit under section 21.012." *ExxonMobil Pipeline Co. v. Harrison Interests, Ltd.,* 93 S.W.3d 188, 192 (Tex.App.-Houston [14th Dist.] 2002, pet. filed) (citing *Hubenak v. San Jacinto Gas Transmission Co.,* 65 S.W.3d 791, 797 (Tex.App.-Houston [1st Dist.] 2002, pet. granted); *State v. Schmidt,* 894 S.W.2d 543, 545 n. 1 (Tex.App.-Austin 1995, no writ)).

■ In the present case, however, the trial court concluded it lacked jurisdiction, not because of defects in the petition, but because the condemnation plan on which the State proposed to proceed in the trial court was not the plan presented to the special commissioners. The latter situation implicates what some courts refer to as the trial court's "appellate jurisdiction" in eminent domain proceedings, as well as to its "power." *See Nelson,* 334 S.W.2d at 791; *Johnston v. Galveston County,* 85 S.W. 511, 513 (Tex.Civ.App.-Galveston 1905, writ dism'd).

Stated another way, the defect lies not in the initiation of the first phase of the condemnation proceedings, but in the matter to be tried in the second phase. In *Nelson,* the supreme court explained:

> [T]he eminent domain jurisdiction of the county court is appellate as distinguished from original or concurrent. The parties may not avoid an initial administrative hearing even if they wish to do so. Our statutes permit the court to act only after the damages have been determined by three disinterested freeholders of the county. When the statutory plan is followed, the parties often accept the commissioners' decision or settle their differences shortly after the award is made. The Legislature evidently had this in mind when it admonished the county judge that in appointing the special commissioners he should give preference to those agreed upon by the parties. Many eminent domain proceedings are thus brought to a prompt and reasonably satisfactory conclusion with a minimum of expense and inconvenience to the parties. A holding that the county court on appeal has all of the power of a court of original jurisdiction would tend to thwart the purpose of the Legislature in providing for the administrative hearing. It would also violate the elementary rule as to the subject matter over which an appellate tribunal may properly exercise its jurisdiction. See *Wilbarger County v. Hall,* Tex.Com. App., 55 S.W.2d 797; 2 Am.Jur. Appeal and Error § 11.
>
> Since the Legislature has not seen fit to give the county court original jurisdiction in eminent domain proceedings, such court does not have unlimited power to enlarge the subject matter of a particular cause by allowing amendments to the pleadings. It could not, for example, acquire by amendment the power to condemn land which is not described in the statement for condemnation and where there is nothing in the statement to suggest that the condemning authority intended to take the same. This is not to say that the court can never order the condemnation of any land other than that which would be conveyed if the description appearing in the statement were used in a deed.

*Nelson,* 334 S.W.2d at 791.

The supreme court then held the trial court had "jurisdiction" to allow the peti-

tion to be amended to include a three-tenths of an acre strip when the original statement of the property to be condemned indicated the State was attempting to take that strip from the beginning. *Id.* at 792. The *Nelson* court, however, cautioned an amendment should not materially prejudice the landowner and should not inject entirely new subject matter into the proceeding. *Id.*

In *Brown v. State*, the Fort Worth Court of Appeals relied on the limiting language in *Nelson* and held the trial court erred when, after the parties had filed objections to the special commissioners' findings, the court allowed the State to file a third amended petition. 984 S.W.2d 348, 350 (Tex.App.-Fort Worth 1999, pet. denied). As described by the appellate court, the amendment "was the first limitation on Brown's right of access after the taking. It limited Brown to only one driveway where two and one-half had previously been and substantially reduced the access rights to the property." *Id.* The appellate court reasoned:

> Allowing free amendment of pleadings to enlarge a taking after the special commissioners have assessed the damages to the property owner would allow a condemning authority to disregard the statutory requirements that a hearing be held before a special commission on the pleadings of the petition for condemnation. If the condemning authority amends its petition of condemnation to take more land or reduce the rights of the condemned property owner after the action is appealed to the trial court, then that court lacks jurisdiction to hear the

case because the amendment enlarged the taking from the proposed taking that the special commissioners considered.

*Id.* The *Brown* court remanded for a new trial of the landowner's appeal from the original condemnation case considered by the commissioners. *Id.* at 350–51.[9]

Citing *Nelson* and *Board of Regents v. Puett,* the State, in fact, concedes that a trial court in an eminent domain proceeding lacks the power to enlarge the subject matter of the cause and is limited to a review of only those issues the special commissioners considered. *See Nelson,* 334 S.W.2d at 791; *Bd. of Regents of the Univ. of Tex. Sys. v. Puett,* 519 S.W.2d 667, 670–71 (Tex.Civ.App.-Austin 1975, writ ref'd n.r.e.). The State, however, urges this court to abrogate the rule set forth in *Nelson* and applied in *Brown.* It asks this court to conclude the trial court "was not ousted of subject-matter jurisdiction merely because the special commissioners considered the [Sparks and Barlow] plan and did not consider the [Corder] plan." From this conclusion, the State reasons the trial court had the power to remand the case to the special commissioners for a redetermination of damages and to allow the parties an opportunity to renegotiate. Finally, the State argues if one of the special commissioners was unavailable, the trial court had the power to appoint new commissioners to hear the case.

The State rests its proposed revision of eminent domain law on the supreme court's decision in *Dubai. Dubai,* however, does not warrant the revisions the State seeks.

9. Both *Nelson* and *Brown* involved amendments to the condemnation petition. In the present case, neither the original nor the amended petition referred to the construction plan or to the change in plan, and the present case, therefore, technically does not involve an "amendment" to the petition. Neverthe-

less, the change in construction plan implicates the policies and reasoning of *Nelson* and *Brown* to the same extent as if the original petition had referred to the Sparks and Barlow plan and the amended petition had referred to the Corder plan.

*Dubai* was a wrongful death case involving Texas Civil Practice and Remedies Code section 71.031, which permits suit for the personal injury or wrongful death of a citizen of a foreign country if the decedent or injured party's country of citizenship has "equal treaty rights" with the United States. *Dubai,* 12 S.W.3d at 73, 74 n. 1; *see* TEX. CIV. PRAC. & REM.CODE ANN. § 71.031(a)(4) (Vernon Supp.2004).[10] The trial court in *Dubai* had dismissed the case for lack of subject-matter jurisdiction because it concluded the decedent's country of citizenship did not have equal treaty rights with the United States. *Dubai,* 12 S.W.3d at 74. The supreme court, however, disagreed, holding the " 'equal treaty rights' requirement is not jurisdictional." *Id.* at 73.

The court acknowledged that, in *Mingus v. Wadley,* it had distinguished common-law causes of action from statutory causes of action, with there being a presumption a state district court had subject-matter jurisdiction over the former, but no such presumption existing in the case of the latter. *Id.* at 75 (citing *Mingus v. Wadley,* 115 Tex. 551, 558, 285 S.W. 1084, 1087 (1926)). The court specifically overruled *Mingus* "to the extent that it characterized the plaintiff's failure to establish a statutory prerequisite as jurisdictional." *Id.* at 76. The court observed one of the practical difficulties resulting from the *Mingus* conceptualization is the potential for leaving judgments vulnerable to attacks based on lack of subject-matter jurisdiction when it is difficult to tell whether the parties have satisfied all the requisites of a particular statute. *Id.*

Regarding the case before it, the court explained: "The trial court in this case had jurisdiction because a claim for wrongful death was within its constitutional jurisdiction, not because the plaintiffs satisfied all the grounds listed in former section 71.031(a)." *Id.* Finally, the court concluded:

> Thus, while defendants in this Court and the Kazis in the court of appeals framed their argument in terms of whether the district court did or did not have subject-matter jurisdiction, we consider those arguments in the context of whether the Kazis established their right under the statute to go forward with this suit. "The right of a plaintiff to maintain a suit, while frequently treated as going to the question of jurisdiction, has been said to go in reality to the right of the plaintiff to relief rather than to the jurisdiction of the court to afford it." 21 C.J.S. Courts § 16, at 23 (1990).

*Id.* at 76–77.

We decline to use *Dubai* to rewrite eminent domain law for a variety of reasons. First, as discussed above, and explained in *Nelson,* the "jurisdiction" at issue in the second phase of an eminent domain proceeding is not subject-matter jurisdiction, but "appellate" jurisdiction, or the power of the court to consider an issue, whereas the jurisdictional challenge at issue in *Dubai* concerned the threshold subject-matter jurisdiction at the stage of filing the original petition. Conceptualized as the power to proceed, the court's "jurisdiction" at the second phase of an eminent domain proceeding is arguably not inconsistent with *Dubai,* and there is no need to change established eminent domain law in light of *Dubai.*

10. Dubai involved the 1993 version of the statute. In 1997, the legislature amended the section, moving the "equal treaty rights" provision to a new subsection without altering the language of the provision. *See Dubai Petroleum v. Kazi,* 12 S.W.3d 71, 74 n. 1 (Tex.2000).

Second, *Dubai* does not address the concerns of fairness and economy set forth in *Nelson* and *Brown*. Conversely, the appellate nature of the trial court's eminent domain jurisdiction and the basis for invoking that jurisdiction (*i.e.*, presentation of the same condemnation plan to the trial court as that presented to the special commissioners) does not implicate the finality concerns of *Dubai*.

Finally, the condemnation procedures set forth in Texas Property Code chapter 21 protect a defendant landowner's constitutionally based right to recover damages when the State takes his property. *See* TEX. CONST. art. I, § 17; *John*, 826 S.W.2d at 140. No similar concerns are implicated by statutes creating a cause of action, such as the statute at issue in *Dubai*.

In sum, *Dubai* provides no basis for changing established eminent domain procedures. The trial court acted consistently with those procedures when it dismissed the case without prejudice, thereby allowing the State to negotiate damages with the property owners under the Corder plan, to file a new petition if they are unable to agree, and to proceed to a special commissioners' hearing based on the Corder plan.

We turn now to the State's contention the trial court should have remanded the case to the special commissioners, and appointed new commissioners if the original commissioners were unavailable. The State suggests authority for such action is found in Texas Property Code section 21.014(a), and *Walling v. State*, 394 S.W.2d 38, 40 (Tex.Civ.App.-Waco 1965, writ ref'd n.r.e.). We disagree.

Section 21.014(a) provides in part:

The judge of a court in which a condemnation petition is filed or to which an eminent domain case is assigned shall appoint three disinterested freeholders who reside in the county as special commissioners to assess the damages of the owner of the property being condemned. . . . If a person fails to serve as a commissioner, the judge may appoint a replacement.

TEX. PROP.CODE ANN. § 21.014(a) (Vernon 2004). In *Walling*, the trial court appointed special commissioners who met and made an award. The defendant landowner, however, had not received the requisite ten-day's notice of the hearing, and the trial court subsequently set the award aside for this reason. 394 S.W.2d at 38–39. The trial court also appointed three new commissioners, who set a hearing date. *Id.* at 39. Before the hearing, the landowner asserted the second set of commissioners had no jurisdiction to act and requested the court to proceed with the first set of commissioners. The second set of commissioners, however, held a hearing and made an award. *Id.* As part of his objection in the trial court, the landowner again asserted the second set of commissioners had no authority to act and prayed the proceeding be abated to give him the opportunity to have the first appointed commissioners act. *Id.* The court overruled the plea in abatement, and the case proceeded to jury trial. *Id.*

After the trial court overruled his motion for new trial, the landowner appealed. The appellees argued the trial court had authority to appoint the second set of commissioners under the precursor to section 21.014 because the first appointed commissioners had "failed to serve." *Id.* The appellate court disagreed, concluding "under the facts the first appointed commissioners did not 'fail to serve,'" the trial court was without authority to appoint the second set, and the hearing and award of the second set was void. *Id.* at 39–40. The appellate court then reversed and remanded with instructions to abate the proceedings until the landowner was notified

as required by law to appear before the first appointed commissioners. *Id.* at 40.

■ Consistent with *Walling,* the trial court in the present case could not appoint new commissioners under Texas Property Code section 21.014(a). There is also nothing in the record to indicate the original set of commissioners is now, or was at the time of the trial court's ruling, still available to serve. Moreover, remanding directly to the special commissioners would have circumvented requiring the parties to negotiate in good faith on the Corder plan, a jurisdictional requirement. *See ExxonMobil Pipeline,* 93 S.W.3d at 192 (regarding good faith negotiations); *see also* TEX. PROP.CODE ANN. § 21.012(b)(4) (Vernon 2004) (petition to state condemnor and property owner unable to agree on damages).

For all of the forgoing reasons, we conclude the trial court correctly dismissed the case because it lacked jurisdiction or power to proceed. Accordingly, we overrule the State's issue one to the extent the State complains of the trial court's dismissal of the case pursuant to the Texas Property Code.

## II. Did the Trial Court Err in Ordering the State to Pay All of Appellees' Attorneys' Fees and Expenses Because the Case was Dismissed?

■ In argument six, the State contends the trial court erred in awarding excessive fees and expenses under the Texas Property Code. The court awarded attorneys' fees and expenses based in part on Texas Property Code section 21.0195, which applies only to a condemnation proceeding involving TxDOT. TEX. PROP.CODE ANN. § 21.0195(a) (Vernon 2004). Subsection (c) provides in relevant part:

> If a court dismisses a condemnation proceeding ... as a result of the failure of the department to bring the proceeding properly, the court shall make an allowance to the property owner for ... any expenses the property owner has incurred in connection with the condemnation, including reasonable and necessary fees for attorneys.

TEX. PROP.CODE ANN. § 21.0195(c) (Vernon 2004).

On appeal, the State's attack on the award of attorneys' fees and expenses under section 21.0195(c) rests solely on its contention it brought the condemnation suit properly.[11] We disagree. Because we have concluded the State's decision to proceed to trial on a plan not presented to the special commissioners deprived the trial court of jurisdiction to proceed, the State's position is untenable. Accordingly, we overrule issue two to the extent the State complains of the award of fees and expenses under the Texas Property Code.

## III. Did the trial court err or abuse its discretion dismissing and awarding fees and expenses as sanctions?

As part of both issues one and two and in arguments two through five, the State contends dismissal and the award of attorneys' fees and expenses as sanctions con-

---

11. In its argument directed at the award of fees and expenses under the Texas Property Code, the State does not challenge the amount of the award. The trial court awarded the fees and expenses to which PRI's and Special Retailer's counsel testified. Although the State cross-examined appellees' witnesses regarding fees and expenses, the State did not present controverting evidence. Moreover, the State's cross-examination regarding fees and expenses, at best, reflected only that counsel could not apportion the amount of fees attributable to the discovery abuse. Under Texas Property Code section 21.0195(c), however, the relevant fees and expenses are those "incurred in connection with the condemnation." TEX. PROP.CODE ANN. § 21.0195(c) (Vernon Supp.2004).

stituted error or an abuse of discretion. The decision to impose sanctions lies within the discretion of the trial court. *See Brainard v. State*, 12 S.W.3d 6, 30 (Tex. 1999) (regarding Frivolous Claims Act); *Bodnow Corp. v. City of Hondo*, 721 S.W.2d 839, 840 (Tex.1986) (regarding discovery sanctions under Rule 215); *In re N.R.C.*, 94 S.W.3d 799, 809 n. 7 (Tex.App.-Houston [14th Dist.] 2002, pet. denied) (regarding inherent power); *Zarsky v. Zurich Mgmt., Inc.*, 829 S.W.2d 398, 399 (Tex.App.-Houston [14th Dist.] 1992, no writ) (regarding Rule 13). Having upheld the trial court's dismissal and award of fees and expenses under the Texas Property Code, we need not address the alternative grounds for upholding the trial court's judgment. *See Lone Star Salt Water Disposal Co. v. R.R. Comm'n*, 800 S.W.2d 924, 931 (Tex.App.-Austin 1990, no writ) (stating appellate courts are under duty to uphold correct lower court judgment on any legal theory, even if lower court has relied on incorrect legal theory and even if lower court has given incorrect reason for its judgment); *In re ExxonMobil Corp.*, 97 S.W.3d 353, 358 n. 5 (Tex. App.-Houston [14th Dist.] 2003, no pet.) (stating trial court cannot abuse its discretion if it reaches right result for wrong reason).

## CONCLUSION

Pursuant to the eminent domain procedures set forth in the Texas Property Code, the trial court correctly dismissed the case without prejudice and awarded appellees their attorneys' fees and expenses incurred in connection with the condemnation. We therefore affirm the judgment of the trial court.