**The STATE of Texas, Appellant,**

v.

**PR INVESTMENTS AND SPECIALTY RETAILERS, INC., Appellees.**

No. 14–00–00091–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Oct. 13, 2005.

Gregory S. Coleman, Joseph David Hughes, Austin, for appellant.

Billy C. Dyer, H. Dixon Montague, W. Allyn Hoaglund, Houston, for appellees.

## MAJORITY EN BANC OPINION

KEM THOMPSON FROST, Justice.

This is a condemnation case in which the State of Texas appeals from the trial court's dismissal of its suit for condemnation of a small portion of a privately-owned tract of land. The main issue in this appeal is the effect of the State's decision, five days before the date set for the trial de novo in the county court at law, to change the specifics of its planned highway project, without changing the allegations in its pleadings and without changing the property that it sought to condemn. The trial court concluded: (1) this change in plans by the State deprived the court of jurisdiction over the trial de novo; (2) this change meant that the State did not bring

this condemnation proceeding properly under section 21.0195(c) of the Texas Property Code, thus justifying an award of all attorney's fees and expenses to the property owners; and (3) the trial court could properly dismiss the condemnation action and award attorney's fees and expenses as sanctions under Texas Rules of Civil Procedure 13 and 215, under the Frivolous Claims Act, and under the trial court's inherent power. Because the trial court erred in all of these conclusions, we reverse its judgment and remand for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellee PR Investments owns a 23-acre tract of land located on the east side of South Main Street approximately one half mile south of Loop 610 and just north of a proposed extension of West Belfort in Harris County. Appellee Specialty Retailers, Inc. owns a leasehold interest in a portion of the 23-acre tract. At this particular location, South Main Street consists of two lanes in each direction separated by a grass median. The Texas Department of Transportation has proposed to convert South Main Street from a four-lane road to Highway 90A—a controlled access highway, six lanes wide with frontage roads for vehicular access to and from the highway, and bridges over all major roads intersecting the highway (hereinafter the "Project"). As part of the construction plan, the State of Texas sought to condemn a strip of PR Investments's property approximately 23 feet, 8 inches wide at the southerly end of the property tapering north to the original right-of-way. This tract of land has a total area of .3407 acres.

The original plan did not provide for acceleration and deceleration lanes on the frontage road for Northbound Highway 90A near the juncture with the driveway from PR Investments's remaining property. (Because the evidence shows that this plan was later certified by Stuart Corder, a traffic engineer, it is hereinafter referred to as the "Corder Plan."). Even before the State filed its petition for condemnation, PR Investments and Specialty Retailers, a tenant doing business on PR Investments's property (hereinafter collectively referred to as the "Property Owners"), expressed concerns regarding whether the highway improvements would impair safe access to the remainder of the property. On November 12, 1997, the State filed its original petition for condemnation, describing the land to be condemned by metes and bounds, but not limiting the State to any particular plan for the Project. Both before and after the State filed the original petition, the State discussed potential modifications to the plan for the Project to accommodate the concerns expressed by the Property Owners. In an attempt to allay their concerns regarding safe access, the Texas Department of Transportation devised another proposed plan in February 1998, which provided a sheltered lane for deceleration of vehicles turning into the property and a corresponding acceleration lane for vehicles exiting the property and returning to the highway. (Because this plan was later certified by Stephen A. Sparks, a traffic engineer, it is hereinafter referred to as the "Sparks Plan.")

The Sparks Plan and the Corder Plan are depicted on the following diagrams:

**Sparks Plan**

**Corder Plan**

Entrance
to PRI
property

Entrance
to PRI
property

The county court at law appointed special commissioners, and the commissioners conducted a hearing on May 6, 1998. Although the Sparks Plan did not contain all

of the modifications to the Corder Plan requested by the Property Owners, Specialty Retailers was satisfied that the Sparks Plan sufficiently addressed its concerns regarding the Project. Therefore, Specialty Retailers did not participate in the special commissioners' hearing. When considering the amount of compensation due to PR Investments, the commissioners were apprised of the proposed plan to construct a sheltered lane for deceleration and acceleration when entering or leaving the remainder of PR Investments's property. Under section 21.042 of the Texas Property Code,[1] at the conclusion of the hearing the commissioners assessed $166,000 as the damages to be paid by the State jointly to PR Investments and Special Retailers. PR Investments and the State both objected to the amount of compensation, and the county court at law ultimately scheduled the trial de novo in the condemnation action for December 6, 1999.

Prior to trial, in late 1999, the Texas Transportation Institute conducted a study in which it concluded the frontage road in front of PR Investments's property "would operate better without the dedicated deceleration lane." Moreover, the Texas Department of Transportation concluded that the proposed deceleration and acceleration lanes would prevent construction of additional driveways into PR Investments's property, thereby limiting access in the future. Accordingly, on December 1, 1999, the Texas Department of Transportation

decided to return to the Corder Plan, which did not contain the deceleration and acceleration lanes contained in the Sparks Plan. The State's attorney advised PR Investments of the Corder Plan the same day it was certified; however, he did not advise Specialty Retailers of this change. Although the State provided a copy of the Corder Plan to PR Investments, it did not supplement various discovery responses that should have been supplemented to reflect the December 1, 1999 switch back to the Corder Plan.

On December 2, 1999, the State filed a motion for leave to file a first amended petition for condemnation. The field notes attached to the amended petition differed slightly from those attached to the original petition. In both sets of field notes, the surveyor first described a point of commencement. From this initial point of reference, the surveyor then directs the reader to the "point of beginning," namely, a corner of the .3407 acre tract sought to be condemned. Though the field notes differ on the exact path from the point of commencement to the point of beginning, the "point of beginning" is the same in both sets of field notes. Thus, the property at issue is the same .3407 acre tract of land in both petitions.[2] As with the original petition, nothing in the amended petition referred to the Sparks Plan or the Corder Plan or required the State to use either of these plans. Although the State filed its motion for leave to amend the petition the

---

1. Unless otherwise specified, all statutory citations in this opinion to sections are to sections of the Texas Property Code.

2. In both the original and amended petitions the point of commencement is the same, namely, "a 1–inch iron pipe found marking the southeasterly corner of a 5.54 acre tract of land conveyed to the City of Houston by deed dated November 17, 1978 and recorded in Clerk's File No. F–859575 of the Harris County Deed Records." The two petitions then

describe a slightly different course of bearings and distances to reach a "point of beginning," namely, the most southeasterly corner of the .3407–acre tract sought by the State. This "point of beginning" is the same in both petitions, i.e., a 5/8–inch iron rod set on the same Texas State Plane Coordinates. Thereafter, the field notes describing the .3407–acre tract are identical in all material respects in the original and amended petitions.

day after it decided to go back to the Corder Plan, this motion did not relate to this change in plans.

On December 7, 1999, at a hearing on the State's motion for leave to file its first amended petition for condemnation, the State's attorney argued that the filing of the amended petition

> ... would create no prejudice to the [Property Owners]. There's nothing about the corrected field notes which would in any way materially affect any issue that [the Property Owners] may raise as to compensation or any other issue with respect to any relief that any party seeks in the lawsuit.

PR Investments objected to the State's motion for leave and put on evidence showing that the Texas Department of Transportation had abandoned its intention to implement the Sparks Plan and decided to implement the Corder Plan, which would eliminate a dedicated lane for the deceleration and acceleration of vehicles entering and leaving the remainder of PR Investments's property. PR Investments argued that the State sought leave to amend its petition in connection with its switch to the Corder Plan and that the motion for leave should be denied because the Corder Plan substantially restricted safe access to the property, thus decreasing the value of PR Investments's remaining property. The trial court determined that the amended petition had nothing to do with the change from the Sparks Plan to the Corder Plan and that it simply made a technical correction to the field notes. Therefore, the trial court granted the State's motion for leave to file its first amended petition.

At the same hearing and immediately after the trial court granted the State's motion for leave to file the amended petition, PR Investments made an oral motion to dismiss for lack jurisdiction. PR Investments argued that the December 1, 1999 change by the State from the Sparks Plan to the Corder Plan deprived the county court at law of jurisdiction over the trial de novo in the condemnation action for the following stated reasons:

(1) The State's change from the Sparks Plan to the Corder Plan deprives the Property Owners of greater rights and imposes greater burdens on the remaining property than did the Sparks Plan; and

(2) The State's change from the Sparks Plan to the Corder Plan affects the damage issues and deprives the court of jurisdiction because the compensation issues presented to the finder of fact in the trial de novo must be the same as the compensation issues previously considered by the three commissioners.

In support of its jurisdictional arguments, PR Investments cited *Brown v. State*, 984 S.W.2d 348, 349–50 (Tex.App.-Fort Worth 1999, pet. denied). Specialty Retailers joined in PR Investments's motion and pointed out that, as of the December 7, 1999 hearing, the State had not given Specialty Retailers any notice of the change from the Sparks Plan to the Corder Plan.

Trial counsel for the State asserted the following responses to the Property Owners' motions:

• His advice to the State "from a litigation perspective" has always been to go back to the Corder Plan.

• The State decided to go back to the Corder Plan in part because it was the better and safer design and in part based on his advice regarding litigation considerations.

• The State's failure to notify Specialty Retailers of the change from the Sparks Plan to the Corder Plan was an oversight.

• The change from the Sparks Plan to the Corder Plan does not increase the burden on the Property Owners in any compensable way.

The trial court then stated that the Property Owners' motions to dismiss raised a material issue as to whether the Property Owners would suffer a compensable, substantial, and material impairment of access, under either the Sparks Plan or the Corder Plan. The trial court decided to hear evidence on these issues. After hearing evidence for the remainder of the day on December 7, 1999, the trial court recessed the hearing and reconvened on December 8, 1999. Before hearing any further evidence, the trial court had an extended discussion with counsel. In the course of this discussion, the trial court stated that it would not admit at trial any evidence that the State intended to build the Project under the Corder Plan even though the State had decided to follow the Corder Plan. The trial court stated that it would allow the State to elect among three options:

(1) dismiss this condemnation suit, pay all of the Property Owners' attorney's fees and expenses, and file a second condemnation action; ·

(2) try this condemnation action based on the Sparks Plan, construct the Project based on the Corder Plan, and then face a likely inverse-condemnation action from the Property Owners; or

(3) decide to construct the Project under the Sparks Plan and try this condemnation action based on the Sparks Plan.[3]

The State's counsel responded that he would consult with his client over the lunch break as to which of these three options the State wished to pursue. After the lunch break, the State informed the trial court and the Property Owners that it was still going to construct the Project based on the Corder Plan and that it would not dismiss this action. The State asserted that the trial court should try the case based on the Corder Plan, but that if the trial court would not do so, then the State, under protest, would follow the second option the trial court offered. The trial court stated that trial would proceed under the Sparks Plan. The State then moved for a continuance, which the trial court denied.

PR Investments then made an oral motion for sanctions under Rule 13[4] of the Texas Rules of Civil Procedure, arguing that the trial court should sanction the State for going to trial on a fiction, because the State did not intend to construct the Project under the Sparks Plan. The trial court then immediately held an evidentiary hearing on PR Investments's motion for Rule 13 sanctions, hearing testimony from several witnesses. After the court heard all testimony that the parties offered on the Rule 13 sanctions motion, the State confirmed again that it intended to proceed with the second option stated above, under protest, having preserved its objections that the trial should not be based on the Sparks Plan because the Project would not be based on that plan. The trial court then stated that, although it had given the State three options, it was now requesting the State to dismiss its condemnation petition. The State declined the trial court's invitation to dismiss its petition.

The trial court then heard further argument, during which Specialty Retailers

---

3. The trial court correctly noted that it could not force the State to build the Project according to the Sparks Plan.

4. Unless otherwise specified, all citations in this opinion to rules are to the Texas Rules of Civil Procedure.

also made an oral motion for Rule 13 sanctions, asserting the same basis as that asserted by PR Investments. The Property Owners asserted that, under Rule 13, the trial court should dismiss the condemnation petition and award the Property Owners all of the attorney's fees, expenses, and costs they had incurred in this case. Finally, the trial court stated that it would be a waste of resources to have two actions—a condemnation action and then an inverse-condemnation action. The court granted the Property Owners' motion for Rule 13 sanctions against the State, dismissed the case without prejudice, and stated that it would award the Property Owners all of their attorney's fees and expenses. The trial court then stated that the Property Owners also would have been entitled to the same sanctions under Rule 215. PR Investments then reurged its prior motion to dismiss for lack of jurisdiction and also moved to dismiss under section 21.0195(c) of the Texas Property Code based on the State's alleged failure to bring the condemnation proceeding properly. The trial court granted these motions. Then, PR Investments asked for the same relief under Rule 215, and the trial court agreed.

After hearing evidence on the amount of the Property Owners' attorney's fees and expenses, the trial court signed a judgment that stated the following, among other things:

- The State did not supplement any of its expert reports, deposition testimony of its witnesses, or its interrogatory answers, responses to requests for production, or responses to requests for disclosure to reflect the State's decision on December 1, 1999, to change from the Sparks Plan to the Corder Plan.
- The State admitted that it had not properly supplemented its discovery regarding the change from the Sparks Plan to the Corder Plan.
- The Corder Plan "could reasonably be construed to impose a substantial, additional burden on the remainder Property not imposed under the [Sparks Plan]."
- "The evidence presented reflected that the [Corder Plan] renders access to the remainder Property unreasonably deficient and unsafe."
- If the case were to be tried based on the "fictitious" Sparks Plan, it would encourage a multiplicity of suits—one to determine the Property Owners' compensation based on the Sparks Plan and another inverse-condemnation suit to determine compensation owed the Property Owners based on the Corder Plan. "This is unfair."
- The State has never given the Property Owners a meaningful administrative hearing to determine the compensation to which they are entitled based on the Corder Plan, even though it is reasonable to conclude that the Corder Plan deprives the Property Owners of greater rights and imposes greater burdens on the remainder property than the Sparks Plan.
- Good cause exists to sanction the State because "[t]he State's trial position, the manner in which it has brought its case to this Court to be tried, and the Petition upon which its case is based are groundless, false, and made in bad faith as supported by the facts and conduct of the State."
- The trial court lacks "jurisdiction to proceed to trial on the [Corder Plan] because it is reasonable to conclude from the evidence and representations of counsel that the [Corder Plan] deprived the Property Owners of greater rights and imposed greater bur-

dens on the remainder Property than did the [Sparks Plan]."

- The State's change from the Sparks Plan to the Corder Plan was a failure to strictly comply with the Texas Property Code that deprived the Property Owners of a meaningful administrative hearing before the commissioners.

- The State "failed to bring its cause of action to this Court properly and in accordance with the Texas Property Code and the Texas Rules of Civil Procedure, justifying dismissal of this case and sanctions in the form of attorney's fees and expenses."

- The State's insistence that it proceed to trial on the "fictitious" Sparks Plan justifies sanctions under Rules 13 and 215 as well as under the trial court's inherent powers.

- Good cause exists for the dismissal of the State's condemnation petition without prejudice and the award to the Property Owners of all of their attorney's fees and expenses under section 21.0195, Rules 13 and 215, the trial court's inherent powers, and, to the extent the State is considered an "Agency of the State," under Chapter 105 of the Texas Civil Practice and Remedies Code.

- A direct relationship exists between the State's conduct and the sanctions imposed; the sanctions imposed are just and not excessive. The trial court made sufficient efforts to avoid imposition of sanctions. The trial court has a reasonable basis to conclude that the State's "fictitious claim" lacked merit, and no lesser sanction was available to the trial court.

- The trial court dismisses the condemnation action without prejudice, orders the State to immediately surrender possession of the property in question, and orders a writ of possession to immediately issue to this effect.

- The trial court orders the State to pay PR Investments $555,651.47, which consists of $144,887.47 in expert witness fees and expenses and $410,764 as PR Investments's reasonable and necessary attorney's fees. In the event the State does not appeal this judgment, the trial court will give the State a credit of $236,511 against the $410,764. If the State appeals to the court of appeals, but does not file a petition for review in the Texas Supreme Court, then it will receive a credit of $91,250 against the attorney's fees award. In the event the State applies for a petition for review and it is denied, then it will receive a credit of $54,750.

- The trial court orders the State to pay Specialty Retailers $95,000 in reasonable and necessary attorney's fees and expenses. In the event the State does not appeal this judgment, the trial court will give the State a credit of $80,000 against the $95,000. If the State appeals to the court of appeals, but does not file a petition for review in the Texas Supreme Court, then it will receive a credit of $40,000 against the attorney's fees award. In the event the State applies for a petition for review and it is denied, then it will receive a credit of $15,000.

The State appealed the trial court's judgment to this court. On original submission, a panel of this court affirmed. *See State v. PR Investments,* 132 S.W.3d 55 (Tex.App.-Houston [14th Dist.] 2004) (withdrawn by today's en banc decision). Having determined that en banc review is justified under Texas Rule of Appellate Procedure 41.2(c), a majority of the jus-

tices of this court have voted to rehear this case en banc.[5]

## II. Issues and Analysis

**A. Did the trial court lose its jurisdiction over the trial de novo in this condemnation action because the State decided to construct the Project based on the Corder Plan rather than the Sparks Plan?**

In its judgment, the trial court concluded that it lacked jurisdiction to conduct a trial de novo as to the Corder Plan because the Corder Plan allegedly deprived the Property Owners of greater rights and imposed greater burdens on the remaining property than the Sparks Plan.[6] The trial court also indicated that it lacked jurisdiction based on its conclusion that the State's change from the Sparks Plan to the Corder Plan was a failure to strictly comply with the Texas Property Code that deprived the Property Owners of a meaningful administrative hearing before the commissioners.[7] In this regard, the trial court believed that it lacked jurisdiction to conduct a trial de novo as to the Corder Plan based on the notion that it only has the power to conduct a trial de novo as to the specific plan that the condemnor intended to pursue at the time of the commissioners' hearing. Therefore, the trial court based its conclusion that it no longer had jurisdiction[8] on the following propositions:

(1) The trial court loses its jurisdiction over a trial de novo in a condemnation action if the condemnor, without changing its petition, changes the specifics of its planned project in a way that deprives the landowner of greater rights and imposes greater burdens on the remaining property than did the former plans; and

(2) Between the commissioners' hearing and the trial de novo in a condemnation action, the trial court loses jurisdiction if a condemnor changes the specifics of its planned project in a way that may affect the damage issues, because the compensation issues presented to the finder of fact in the trial de novo must be the same as the compensation issues previously considered by the three commissioners.[9]

---

**5.** Five amici curiae have appeared in support of the State's motion for en banc reconsideration—(1) Harris County, Texas, (2) Metropolitan Transit Authority of Harris County, Texas, (3) North Harris County Regional Water Authority, (4) Southwestern Bell Telephone, L.P., and (5) Centerpoint Energy Houston Electric, L.L.C. These five acquiring authorities, consisting of both governmental bodies and private entities vested by the legislature with the power of eminent domain, argue that the panel's opinion is contrary to longstanding precedents from this court and the Texas Supreme Court and that, if left intact, the impact of the panel's opinion would extend well beyond the facts of this case.

**6.** *See* Conclusion 9 in the trial court's judgment.

**7.** *See* Conclusion 10 in the trial court's judgment.

**8.** The en banc dissenting opinion finds significance in a purported distinction between a loss of "subject matter jurisdiction" on the one hand and a loss of "jurisdiction," or "appellate jurisdiction" or "power to act" on the other hand. Whichever term is used, the trial court loses its power to do anything other than dismiss the case, and the proceedings are void, with any judgment subject to collateral attack. *See University of Tex. Southwestern Med. Ctr. at Dallas v. Loutzenhiser,* 140 S.W.3d 351, 358–59 (Tex.2004) (referring interchangeably to "subject matter jurisdiction," "jurisdiction," and "power to act"). This opinion refers to an alleged loss of "jurisdiction."

**9.** The en banc dissenting justices agree with this second proposition, and they appear to agree with the first proposition as well. *See post,* op. at p. 679 (stating that "a trial court in an eminent domain proceeding lacks the

For the reasons set forth below, we conclude that neither of these propositions is correct.

 Chapter 21 of the Texas Property Code sets forth the procedures for condemnation proceedings. *See* TEX. PROP. CODE ANN. § 21.001, *et seq.* In construing this statute, we must keep in mind that the procedures for condemnation should be strictly followed and their protections liberally construed for the benefit of landowners. *See John v. State,* 826 S.W.2d 138, 140 (Tex.1992). In liberally construing the condemnation statute, courts should give full meaning to the statute's language so as to carry out the Texas Legislature's manifest intent in enacting the statute; however, courts cannot use this doctrine of liberal construction as a license to create new requirements that go beyond the plain meaning of the condemnation statute. *See Coastal States Gas Producing Co. v. Pate,* 158 Tex. 171, 309 S.W.2d 828, 831 (1958).

If a condemnor, such as the State of Texas in this case, wants to acquire real property for public use but is unable to agree with the owner of the property on the amount of damages, the condemnor may initiate a condemnation proceeding by filing a petition that (1) describes the property to be condemned, (2) states the purpose for which the entity intends to use the property, (3) states the name, if known, of the owner of the property, and (4) states that the condemnor and the property owner are unable to agree on the damages. *See* TEX. PROP.CODE ANN. § 21.012 (Vernon 1984). The Texas Supreme Court recently decided that these statutory requirements are not jurisdictional. *See Hubenak v. San Jacinto Gas Transmission Co.,* 141 S.W.3d 172, 183–84 (Tex.2004). The record in this case shows that the State complied with all of these statutory requirements in both its original and amended petitions.[10]

 The State's amended petition made a technical correction to the property description. Nonetheless, the amended petition did not change the property to be condemned, and the amended petition was not tied to the State's decision to return to the Corder Plan. The original petition and the amended petition make no reference to any specific plan the State intends to pursue with the property sought to be condemned. Though the State can elect to limit itself to a specific plan in its condemnation petition, the condemnation statute does not require the State to do so. *See Coastal Indus. Water Auth. v. Celanese*

---

power to enlarge the subject matter of the cause and is limited to a review of those damages issues the special commissioners considered" and stating that "none of the cited cases [in the majority opinion] involve a situation in which the condemnor made substantial and prejudicial changes to its condemnation plans after presenting those plans to the special commissioners").

**10.** The trial court did not conclude that the State failed to comply with section 21.012's "unable to agree" requirement. However, PR Investments refers in various parts of its appellate briefing to the "good faith" component of this requirement. *See Hubenak,* 141 S.W.3d at 185–87 (citing cases that require condemnor to negotiate in good faith or make a bona fide effort in conjunction with the "unable to agree" requirement). The Texas Supreme Court has rejected this good-faith analysis, and has held that it is not part of the "unable to agree" requirement. *See id; Malcomson Road Util. Dist. v. Newsom,* 171 S.W.3d 257, 276 (Tex.App.-Houston [1st Dist.] 2005, no pet. h.). In any event, even under the former good-faith analysis, the time frame for this analysis was before the condemnation petition was filed. *See Hubenak,* 141 S.W.3d at 180–81. Therefore, even the former analysis would not apply to the State's return to the Corder Plan, a decision the State made more than two years after filing its condemnation petition.

*Corp. of America*, 592 S.W.2d 597, 600–603 (Tex.1979) (holding that condemnor's statement in petition that it sought to acquire an easement "for the transportation of water and other facilities and uses incidental thereto or in connection therewith for Trinity Water Conveyance System" was a sufficient statement of the purpose for which the condemnor intended to use the property under section 21.012(b)(2) and that no further specification of purpose was necessary, although specifics can be added at the condemnor's option if it wishes to limit its rights in the condemned property). In this case, the State chose not to limit itself to the Sparks Plan or any other plan in its petition.

When a condemnor files a condemnation petition, the judge of the court appoints "three disinterested freeholders who reside in the county as special commissioners to assess the damages." Tex. Prop.Code Ann. § 21.014(a) (Vernon 1984). These commissioners convene a hearing and determine the value of the property condemned and any damage to the remainder. *See id.* §§ 21.014–016 (Vernon 1984). Any party may object to the special commissioners' findings, and if there are objections, the court shall cite the adverse party and conduct a trial de novo. *See id.* § 21.018 (Vernon 1984). The Texas Supreme Court has described the period from the filing of the condemnation petition until the filing of any objections to the commissioners' findings as an "administrative proceeding" that converts into a "normal pending cause" when a party files objections to the commissioners' findings.[11] *See Hubenak*, 141 S.W.3d at 179.

Texas courts have held that the following alleged defects and errors regarding the commissioners are not jurisdictional:

- improperly exchanging benches with judge to which condemnation case was assigned so that judge who appointed commissioners was not presiding judge in court to which condemnation case was assigned, *Pinnacle Gas Treating, Inc. v. Read*, 160 S.W.3d 564, 566–67 (Tex.2005) (stating that any such error was curable by filing timely objection to trigger trial de novo);

- failing to give preference in appointing commissioners to persons on whom the parties agree, as required by statute, *Fort Worth & D.N. Ry. Co. v. Johnson*, 125 Tex. 634, 84 S.W.2d 232, 234 (1935) (stating that any such error was curable by trial de novo);

- appointing commissioners who were not disinterested, as required by statute, because they would be partially responsible for paying the damages awarded in the condemnation proceeding, *Gulf, C. & S.F. Ry. Co. v. Ft. Worth & R.G. Ry. Co.*, 86 Tex. 537, 26 S.W. 54, 60 (1894) (stating that any such error was curable by filing timely objection to trigger trial de novo);

- the county court at law erroneously quashing subpoenas, thus preventing evidence regarding damages from being heard at the commissioners' hearing, *Blasingame v. Krueger*, 800 S.W.2d 391, 393–94 (Tex.App.-Houston [14th Dist.] 1990, orig. proceeding) (stating that any such error was curable by filing timely objection to trigger trial de novo);

- the failure of the commissioners to hear evidence, *City of Houston v. Bankers Mortg. Co.*, 514 S.W.2d 326,

---

**11.** In this opinion, we refer to this second part of the condemnation proceedings as the trial de novo. This nomenclature is consistent with the statutory language and the lan- guage used by the *Hubenak* court. However, even if we instead used the term "de novo appeal," it would not change the analysis.

328 (Tex.App.-Houston [1st Dist.] 1974, writ ref'd n.r.e.); and

- having only two of the three commissioners appointed by the trial court hold the hearing and issue findings. *City of Houston v. Stovall,* 249 S.W.2d 246, 246–48 (Tex.Civ.App.-Galveston 1952, writ ref'd n.r.e.).

 Nothing in the condemnation statute prohibits the condemnor from changing its specific plan for the property after the commissioners' hearing in a way that allegedly prejudices the landowners. *See Coastal Indus. Water Authority,* 592 S.W.2d at 601 (stating that "[t]he petition in a condemnation proceeding also serves as notice to the landowner of the damages to which he may be entitled, and as the basis for evidence and issues on the question of damages"). Nor does any statutory provision require the damage issues in the trial de novo to be the same as those considered by the commissioners. *See Coastal Indus. Water Auth.,* 592 S.W.2d at 600–603; *Blasingame,* 800 S.W.2d at 393–94 (indicating that evidence at trial de novo is not limited to the evidence introduced at commissioners' hearing and stating that the trial de novo involves "trying the matter anew; the same as if it had not been heard before and as if no decision had been previously rendered") (quotations omitted); *Kennedy v. City of Dallas,* 201 S.W.2d 840, 841–42 (Tex.Civ.App.-Dallas 1947, writ ref'd n.r.e.) (stating that trial de novo in condemnation case is not confined to the evidence offered at the commission-

ers' hearing). Accordingly, the two legal bases upon which the trial court apparently concluded that it lacked jurisdiction to conduct a trial de novo regarding the Corder Plan have no basis in the condemnation statute and are erroneous statements of law.[12] Although this court liberally construes the statutory protections the Legislature has provided to landowners in condemnation actions, this liberal construction does not justify judicial creation of protections that have no basis in the unambiguous language of the condemnation statute. *See Coastal States Gas Producing Co.,* 309 S.W.2d at 831.

Furthermore, the cases on which the Property Owners and our dissenting colleagues rely do not require a contrary result. The *State v. Nelson* case deals with whether the agreed amendment to the condemnor's petition deprived the trial court of jurisdiction by adding property to the land sought to be condemned. *See* 160 Tex. 515, 334 S.W.2d 788, 790–92 (1960). The *Nelson* court held that, under the circumstances of that case, the amendment to the petition did not deprive the trial court of jurisdiction over the trial de novo. *See id.* The statements on which the Property Owners and the dissenters rely are obiter dicta.[13] *See id.* at 791. The statement that the parties may not avoid a hearing by the commissioners does not conflict with the analysis in the instant case. The commissioners in this case held a hearing based on the petition filed by the State, and the commissioners issued their findings. The parties did not avoid a

---

12. Even presuming for the sake of argument that the condemnation statute did contain the two requirements mentioned above, these requirements still would not be jurisdictional. *See Pinnacle Gas Treating, Inc.,* 160 S.W.3d at 566–67; *Hubenak,* 141 S.W.3d at 175–84; *Fort Worth & D.N. Ry. Co.,* 84 S.W.2d at 234; *Gulf, C. & S.F. Ry. Co.,* 26 S.W. at 60; *Stovall,* 249 S.W.2d at 246–48.

13. Our dissenting colleagues assert that the statements on which they rely from *Nelson* are judicial dicta rather than obiter dicta. *See post,* op. at p. 679 n. 5. Under the standard for distinguishing between obiter dicta and judicial dicta, we respectfully disagree. *See Edwards v. Kaye,* 9 S.W.3d 310, 314 (Tex. App–Houston [14th Dist.] 1999, pet. denied).

hearing by the commissioners. This statement from *Nelson* does not mean that the damage evidence and arguments in the trial de novo must be the same as in the commissioners' hearing, nor does it mean that the change to the Corder Plan deprives the trial court of jurisdiction. Although *Nelson* states in obiter dictum that the condemnation statute permits the court to act only after damages have been determined by three disinterested freeholders, to the extent *Nelson* implies that this is a jurisdictional prerequisite, this dictum is contrary to prior Texas Supreme Court precedent that our high court has recently reaffirmed. *See Pinnacle Gas Treating, Inc.*, 160 S.W.3d at 567 (citing *Gulf, C. & S.F. Ry. Co.* as good law); *City of Bryan v. Moehlman*, 155 Tex. 45, 282 S.W.2d 687, 688–89 (1955) (stating that condemnation proceeding was not void for lack of jurisdiction even if commissioners were not disinterested and relying on *Gulf, C. & S.F. Ry. Co.*); *Gulf, C. & S.F. Ry. Co.*, 26 S.W. at 60 (holding that trial court did not lose jurisdiction over trial de novo in condemnation action, even if the commissioners were not disinterested because they were partially responsible for paying the damages awarded in the condemnation proceeding). The *Nelson* court correctly states that the trial court does not have original jurisdiction over condemnation actions and that it does not have unlimited power to enlarge the subject matter of a condemnation case by allowing amendments to the pleadings, but these statements do not affect the analysis in this case. The amendment to the State's petition was a technical one that had nothing to do with the Corder Plan, and the trial court would not have been expanding the subject matter of the condemnation case by allowing evidence of the Corder Plan at trial.

The *Brown v. State* decision deals only with the issue of whether the trial court abused its discretion in granting the condemnor leave to amend its petition in a case in which the condemnor, unlike the State in the instant case, chose to specify details of its plans in its condemnation petition. *See* 984 S.W.2d 348, 349–50 (Tex. App.-Fort Worth 1999, pet. denied). Further, whereas the Property Owners and the dissenters seek to limit the issues in the de novo trial to the evidence and the specific plan before the commissioners at their hearing, *Brown* states that "[t]he trial court's appellate jurisdiction is limited to the parties and issues involved in the administrative proceeding before the special commission, *as set out in the condemning authority's petition* which is the only pleading required at that time." *Brown*, 984 S.W.2d at 350 (emphasis added).

The *Puett* case does state in dicta that the trial de novo in condemnation cases is limited to the issues involved in the commissioners' hearing and that the trial court can only review matters that were properly before the commissioners. *See Board of Regents of Univ. of Tex. Sys. v. Puett*, 519 S.W.2d 667, 670–71 (Tex.Civ.App.-Austin 1975, writ ref'd n.r.e.). These obiter dicta are incorrect. For example, the trial court in a trial de novo has the power to determine whether the condemnor has the right to condemn the property; whereas the commissioners are limited to issuing findings as to the amount of compensation they believe should be awarded for the condemnation. *See Amason v. Natural Gas Pipeline Co.*, 682 S.W.2d 240, 242 (Tex.1984). Likewise, the evidence at the trial de novo is not limited to the evidence introduced at the commissioners' hearing. *See Blasingame*, 800 S.W.2d at 393–94; *Kennedy*, 201 S.W.2d at 841–42. Also, despite the fact that the trial will involve significantly different compensation issues from the commissioners' hearing, the coun-

ty court at law maintains jurisdiction to try a condemnation case, even after the condemnor has amended its petition to seek condemnation of a significantly smaller portion of the land previously sought to be condemned, and even though the commissioners' hearing and findings were based on the larger piece of land. *See Board of Regents of the Univ. of Houston Sys. v. FKM Partnership, Ltd.,* 178 S.W.3d 1, 5–6 (Tex.App.-Houston [14th Dist.] 2005, no pet. h.). The obiter dicta from *Puett* are not persuasive as to the issues involved in the instant case.

Contrary to the Property Owners' arguments and the trial court's legal conclusions, the condemnation statute does not (1) prohibit the condemnor from changing its specific plan for the property after the commissioners' hearing in a way that allegedly prejudices the landowners, or (2) require the damage issues in the trial de novo to be the same as those considered by the commissioners. The timing of the State's change from the Sparks Plan to the Corder Plan and the State's failure to supplement various discovery responses may have raised issues as to whether the trial court should assess discovery sanctions against the State, but the trial court was not divested of its jurisdiction based on this change. Accordingly, we hold that the trial court did not lose jurisdiction over the trial de novo in this condemnation action, and therefore the trial court erred in ruling that it lacked jurisdiction.

**B. Did the trial court err in dismissing the condemnation action under section 21.0195 of the Texas Property Code based on its conclusion that the State failed to bring the condemnation proceeding properly?**

In its judgment, the trial court also dismissed without prejudice the condemnation action and awarded the Property Owners all of their attorney's fees and expenses under section 21.0195(c) of the Texas Property Code.[14] *See* TEX. PROP.CODE ANN. § 21.0195(c) (Vernon Supp.2004). This statutory provision allows a trial court to dismiss a condemnation proceeding and award attorney's fees and expenses to the property owners if the Texas Department of Transportation fails to bring the proceeding properly.[15] *See id.* The asserted ways in which the State failed to bring the condemnation proceeding properly and in accordance with the Texas Property Code are the same grounds upon which the trial court concluded it lacked jurisdiction. The State asserts that it brought this condemnation proceeding properly.[16] As discussed

---

14. *See* Conclusions 11 and 17 in the trial court's judgment. The trial court awarded attorney's fees and expenses under "the Texas Property Code, including § 21.0195." On appeal, the only part of the Texas Property Code on which the Property Owners rely to justify this part of the trial court's judgment is section 21.0195(c). A review of the Texas Property Code shows that this section is the only part of the statute that arguably would apply to the facts of this case. *See* TEX. PROP.CODE. ANN. § 21.0195(c) (Vernon Supp.2004).

15. The record reflects that this condemnation proceeding involves the Texas Department of Transportation, and we presume for the sake of argument that section 21.0195 applies. *See*

TEX. PROP.CODE. ANN. § 21.0195(a) (stating that section 21.0195 applies only to dismissals of condemnation proceedings that involve the Texas Department of Transportation).

16. The issue of whether the trial court erred in dismissing this case based on its determination that the State failed to comply with the Texas Property Code is a subsidiary question that is fairly included in the two issues presented in the State's opening brief on appeal. *See* TEX.R.APP. P. 38.1(e). In this brief, the State noted that the trial court dismissed in part based on its conclusion that the State had failed to strictly comply with the condemnation procedures of the Texas Property Code. The State also argued that the trial

above, the State complied with the applicable sections of the Texas Property Code. Therefore, the trial court erred in determining that the State failed to bring this proceeding properly and in dismissing the condemnation action and awarding attorney's fees and expenses under section 21.0195(c).

### C. Did the trial court err in assessing sanctions under Rule 13?

The trial court also dismissed the State's condemnation proceeding without prejudice and awarded the Property Owners all of their attorney's fees and expenses under Rule 13. This rule, entitled "Effect of Signing of Pleadings, Motions and Other Papers; Sanctions," states in pertinent part:

> The signatures of attorneys or parties constitute a certificate by them that they have read the pleading, motion, or other paper; that to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment. Attorneys or parties who shall bring a fictitious suit as an experiment to get an opinion of the court, or who shall file any fictitious pleading in a cause for such a purpose, or shall make statements in pleading which they know to be groundless and false, for the purpose of securing a delay of the trial of the cause, shall be held guilty of a contempt. If a pleading, motion or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, after notice and hearing, shall impose an appropriate

[sanction].... No sanctions under this rule may be imposed except for good cause, the particulars of which must be stated in the sanction order. "Groundless" for purposes of this rule means no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law.

*Id.*

 We review a sanctions order under Rule 13 for an abuse of discretion. *See Elkins v. Stotts–Brown,* 103 S.W.3d 664, 667 (Tex.App.-Dallas 2003, no pet.). When determining whether Rule 13 sanctions are proper, the trial court must examine the circumstances existing at the time the litigant filed the pleading. *See id.* at 668. Rule 13 requires the trial court to base sanctions on the acts or omissions of the party or counsel. *See* Tex.R. Civ. P. 13; *Elkins,* 103 S.W.3d at 668. The trial court must examine the facts available to the litigant and the circumstances existing at the time the pleading was signed. *See Elkins,* 103 S.W.3d at 668. In this context, bad faith is not simply bad judgment or negligence; rather, it is the conscious doing of a wrong for dishonest, discriminatory, or malicious purposes. *See id.* at 669. Harassment in the context of Rule 13 means that the pleading was intended to annoy, alarm, and abuse another person. *See id.* Courts must presume that papers are filed in good faith, and the party moving for sanctions bears the burden of overcoming this presumption. *See id.* at 668.

 The trial court based its Rule 13 sanctions on its finding that "[t]he State's

---

court erred in determining that the State failed to bring this proceeding properly and in awarding expenses and attorney's fees under section 21.0195(c). In applying the Texas Rules of Appellate Procedure, including Rule 38.1, the Texas Supreme Court has instructed courts of appeals to construe these procedural

rules reasonably, yet liberally, so that a party's right to appeal is not compromised by imposing requirements that are not absolutely necessary to effect the purpose of the rule in question. *Republic Underwriters Ins. Co. v. Mex–Tex, Inc.,* 150 S.W.3d 423, 427 (Tex. 2004).

trial position, the manner in which it has brought its case to this Court to be tried, and the Petition upon which its case is based are groundless, false, and made in bad faith as supported by the facts and conduct of the State." The trial court also stated that Rule 13 sanctions are justified by the State's insistence that it proceed to trial on the "fictitious" Sparks Plan, knowing that it would base the Project on the Corder Plan. The trial court stated that this insistence constitutes bad faith and harassment, justifying sanctions under Rule 13.[17]

█ First, the trial court based its Rule 13 sanctions in part on the State's trial position, the manner in which it prosecuted this action, and its acceptance of the trial court's invitation to go to trial on the Sparks Plan even though the State would build the Project based on the Corder Plan. To this extent, the trial court abused its discretion because Rule 13 sanctions are not based on a party's conduct during the prosecution of the action; rather, they are based on the signing and filing of pleadings in violation of the duties imposed by Rule 13. *See Elkins*, 103 S.W.3d at 668–69.

To base the sanctions on the signing of the pleadings, the trial court had to find at least one of the following:

(1) That, at the time State's counsel, Anthony J. Blazi, signed the original condemnation petition, to the best of his knowledge, information, and belief formed after reasonable inquiry, the petition was groundless and brought in bad faith or groundless and brought for the purpose of harassment; or

(2) That, at the time State's counsel, Elizabeth Elleson, signed the amended condemnation petition, to the best of her knowledge, information, and belief formed after reasonable inquiry, the petition was groundless and brought in bad faith or groundless and brought for the purpose of harassment.

*See id.*

█ The trial court did not state either of the above as a basis for its Rule 13 sanctions, and the record contains no evidence that would support any such findings.[18] As noted above, neither petition limited the State to any particular plan. Further, the main basis of the sanctions in general appears to have been the State's acceptance of the trial court's invitation to go to trial based on the Sparks Plan, even though the State would construct the Project based on the Corder Plan. Neither this conduct nor the Corder Plan have any connection with the signing and filing of the State's petitions and the allegations contained therein. In any event, after reviewing the evidence in the record, we find no evidence that either the original petition or the amended petition was groundless and brought in bad faith or groundless and brought for the purpose of harassment.[19] *See Elkins*, 103 S.W.3d at 668–69

17. The trial court also stated in its judgment that it had a reasonable basis to conclude that the State's "fictitious claim" lacked merit. However, any alleged lack of merit in the State's condemnation petition is not sufficient to justify Rule 13 sanctions. *See Elkins*, 103 S.W.3d at 668 (stating that a pleading's lack of merit is not a sufficient basis for Rule 13 sanctions).

18. It should be noted that the trial court had a duty to set forth expressly and with particularity the acts or omissions on which it based its Rule 13 sanctions. *See Jimenez v. Transwestern Prop. Co.*, 999 S.W.2d 125, 130 (Tex. App.-Houston [14th Dist.] 1999, no pet.).

19. Perhaps in tacit recognition of this reality, after finding that the State had violated Rule 13, the trial court dismissed the State's petition without prejudice to the refiling of a new

(reversing Rule 13 sanctions for lack of evidence).

Further, without regard to the certificates made under Rule 13 by the signers of the pleadings, Rule 13 also provides for sanctions against attorneys or parties who bring a fictitious suit or who file any fictitious pleading as an experiment to get an opinion of the court. Although the trial court described the Sparks Plan and the State's condemnation action as "fictitious," there is no evidence or finding by the trial court that any party or attorney filed this condemnation action or any pleading herein as an experiment to get an opinion from the court. Therefore, the trial court erred to the extent it assessed Rule 13 sanctions on this basis.[20]

In sum, no evidence in the record supports the trial court's finding of a Rule 13 violation or the assessment of Rule 13 sanctions against the State in this case. *See Elkins,* 103 S.W.3d at 668–69. Accordingly, the trial court erred to the extent it dismissed the State's condemnation petition and ordered the State to pay the Property Owners' attorney's fees and expenses under Rule 13.

**D. Did the trial court err in assessing sanctions under the Frivolous Claims Act?**

The trial court also awarded relief against the State under the Frivolous Claims Act, to the extent the State is a "State agency" thereunder. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 105.001, *et seq.* Because the State asserts in its condemnation petition that it brings the condemna-

tion action by and through the Texas Transportation Commission, it would appear that the State qualifies as a "State agency" for the purposes of the Frivolous Claims Act. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 105.001(3) (defining "State agency" to include an executive-branch commission created by a Texas statute that has statewide jurisdiction).

To obtain sanctions under the Frivolous Claims Act, the Property Owners had to file a written motion alleging that the State's claim is frivolous, unreasonable, or without foundation. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 105.003(a). The Property Owners never filed a written motion for sanctions in the trial court, and the trial court overruled the State's objection that the motion for sanctions was not in writing. On this basis alone, the trial court abused its discretion in assessing sanctions under the Frivolous Claims Act. Furthermore, the Texas Supreme Court has held that relief under the Frivolous Claims Act is not available simply because a state agency *acts* frivolously, unreasonably, or without foundation. *Brainard v. State,* 12 S.W.3d 6, 30 (Tex.1999), *disapproved of on other grounds by Martin v. Amerman,* 133 S.W.3d 262, 267–68 (Tex. 2004). Rather, relief is proper only when the state agency asserts a *claim* that is "frivolous, unreasonable, or without foundation." *Id.* A claim may be deemed unreasonable under the Frivolous Claims Act when the totality of the tendered evidence fails to demonstrate any arguable basis for the claim. *Id.* For the reasons stated above, there is no evidence in the record to

condemnation action. We need not and do not address whether it can ever be appropriate to find that Rule 13 has been violated and then to dismiss the petition without prejudice to refiling.

**20.** Making statements known to be groundless and false in a pleading, for the purpose of

securing a delay of the trial of the cause, is another potential basis for Rule 13 sanctions. However, there is no contention that this ground applies here, nor is there any evidence or finding by the trial court to support this ground.

show that, under the Frivolous Claims Act, the State's condemnation claim is frivolous, unreasonable, or without foundation. *See id.* (reversing and rendering as to the trial court's award of relief under the Frivolous Claims Act). Accordingly, the trial court erred to the extent it dismissed the State's condemnation petition and ordered the State to pay the Property Owners' attorney's fees and expenses under the Frivolous Claims Act.

**E. Did the trial court err in assessing sanctions under Rule 215 and under the court's inherent power?**

 The decision to sanction a litigant for discovery abuse lies within the discretion of the trial court. *Thompson v. Davis,* 901 S.W.2d 939, 940 (Tex.1995). Rules 215.2(b) and 215.3 allow the trial court to impose sanctions for failure to comply with proper discovery requests or for abuse of the discovery process. *See* Tex.R. Civ. P. 215.2(b). Legitimate purposes of discovery sanctions include: (1) securing compliance with discovery rules; (2) deterring other litigants from similar misconduct; and (3) punishing violators. *Arkla, Inc. v. Harris,* 846 S.W.2d 623, 628–29 (Tex.App.-Houston [14th Dist.] 1993, orig. proceeding).

 Discovery sanctions must be just. Tex.R. Civ. P. 215.2(b); *Thompson,* 901 S.W.2d at 940. Therefore, the trial court's discretion is limited in at least the following ways: (1) there must be a direct relationship between the offensive conduct and the sanction imposed; and (2) the sanction imposed must not be excessive. *See Arkla, Inc.,* 846 S.W.2d at 628. In other words, the punishment should fit the crime; the sanction must be directed against the abuse and toward remedying the prejudice caused to the innocent party. *See id; Thompson,* 901 S.W.2d at 940. All of the foregoing requirements also apply to a trial court's exercise of its inherent power to sanction. *Greiner v. Jameson,* 865 S.W.2d 493, 499 (Tex.App.-Dallas 1993, writ denied). The trial court recognized that these standards apply to its sanctions ruling. The trial court expressly stated that dismissing the action without prejudice and awarding the Property Owners all of their attorney's fees and expenses is a just sanction that is not excessive. The trial court further stated that these sanctions bear a direct relationship to the State's conduct and that there is no lesser sanction available. Based on the statements in the trial court's judgment, the following is all of the possible conduct by the State that may have been the basis for the sanctions in question:

- The State's decision on December 1, 1999, to switch from the Sparks Plan back to the Corder Plan.[21]

- In violation of the discovery rules, the State did not supplement any of its expert reports, deposition testimony of its witnesses, or its interrogatory answers, responses to requests for production, or responses to requests for disclosure to reflect the State's decision to change from the Sparks Plan to the Corder Plan.

- If the case were to be tried based on the "fictitious" Sparks Plan, it would encourage a multiplicity of suits—one to determine the Property Owners' compensation based on the Sparks Plan and another inverse-condemnation suit to determine compensation owed the Property Owners based on the Corder Plan. "This is unfair."

---

**21.** This decision would not constitute discovery abuse; however, it might be argued that the trial court could exercise its inherent power to sanction this conduct, and we will presume so for the sake of argument.

- "The State's trial position, the manner in which it has brought its case to this Court to be tried, and the Petition upon which its case is based are groundless, false, and made in bad faith. . . ." [22]
- The State's "insistence that it proceed to trial on the fictitious [Sparks Plan]."

As discussed above, the State's decision to change from the Sparks Plan to the Corder Plan did not cause the State's condemnation action to violate the Texas Property Code. The trial court incorrectly states that the State insisted on proceeding to trial on the Sparks Plan even though the State actually intended to use the Corder Plan. The State did not insist on such a trial. Rather, the State wanted to go to trial on the plan that it actually intended to use—the Corder Plan—after a continuance to allow the Property Owners additional discovery regarding the Corder Plan. The State also indicated to the trial court that it would be appropriate for the trial court to order the State to pay the Property Owners for the increased expenses, including attorney's fees and expert fees, caused by the switch from the Sparks Plan to the Corder Plan.[23] The State has reiterated this position on appeal.

Although the trial court indicated at one point that a continuance might be appropriate, it denied the State's motion for continuance after the Property Owners objected. In any event, the State accepted one of the three options offered by the trial court, under protest that it wanted a trial based on the Corder Plan. The State did not insist on a trial based on the Sparks Plan. Although the State did refuse to nonsuit this action, it had the right to do so, and, as discussed above, the trial court had no basis to dismiss this action under section 21.0195(c).

In its appellate brief, PR Investments implies that the State engaged in improper conduct because (1) the State urged the trial court to go to trial based on the Sparks Plan, even though all parties knew that the construction would be based on the Corder Plan, and (2) the State knew that PR Investments would not be allowed to recover its additional damages in a subsequent inverse-condemnation action. *See City of La Grange v. Pieratt*, 142 Tex. 23, 175 S.W.2d 243, 246 (1943) (holding that after condemnation action, landowners cannot recover in subsequent suit any damages that reasonably could have been foreseen at the time of the prior condemnation action). The trial court, however, did not list any such alleged knowledge or motive by the State as part of the State's allegedly sanctionable conduct. There is no evidence in the record that the State's attorney was aware of the *Pieratt* rule. Furthermore, the Property Owners said nothing to the trial court about such poten-

---

22. Again, this conduct would not appear to be a violation of any discovery rule, but we presume for the sake of argument that it could have been considered as a basis of sanctions under the trial court's inherent power.

23. On appeal, PR Investments asserts that accepting the State's offer in this regard and ordering the State to pay these attorney's fees would not have been a meaningful sanction because the State already had an obligation to pay these fees based on the alleged prejudice to the Property Owners caused by the State's

amendment of its condemnation petition. As noted above, the amendment of this petition did not relate to the change to the Corder Plan. Further, the trial court granted the State's motion for leave to file this amended petition and awarded no sanctions or damages based on any alleged prejudice to the Property Owners arising therefrom. In fact, if it had found such prejudice, the trial court would not have granted the State's motion for leave to amend.

tial problems with a subsequent inverse-condemnation action. In fact, counsel for PR Investments indicated that such an action was available:

> [trial court]: [I]f they [the State] do in fact not go forward with that plan [Sparks Plan] then obviously you've got your inverse suit.

> [PR Investments's counsel]: Exactly, we do, but if representation is being made at the time we go to trial that they're going to do something other than that which they represented they were going to do, then we're going to trial on a fiction, as [counsel for the State] correctly pointed out, that we're going to trial based on something the Highway Department is not going to do.

The Property Owners drafted, and approved as to form and substance, the proposed judgment that the trial court eventually signed.[24] This judgment affirmatively states that any additional damages caused by the Corder Plan would have to be determined in a subsequent inverse-condemnation action. In sum, the record indicates that, during the proceedings in the trial court, the parties' counsel and the trial court were not aware of the *Pieratt* rule.

Although the trial court did not consider the effect of the *Pieratt* rule, it appears that the inefficiency of having two suits, which the trial court mentioned in its judgment, would have been mitigated by the fact that the *Pieratt* rule would have barred the second action. Of course, there still would be issues of fairness.[25] However, this unfairness does not constitute

sanctionable conduct by the State, and it could have been mitigated by a sanction that ordered the State to pay the increase in expenses, including attorney's fees and expert fees, caused by the switch from the Sparks Plan to the Corder Plan. In any event, the unfairness of an option proposed by the trial court should not be the basis for sanctioning a party who accepts that option at the trial court's invitation.

The trial court stated there was a relationship between the State's conduct, on the one hand, and, on the other hand, the trial court's dismissal of the condemnation action, which would force the State to start all over again, and the trial court's order that the State pay more than $650,000 as a sanction. The record, however, does not show that the State's failure to properly supplement its discovery responses or any other sanctionable conduct is directly related to these sanctions. Therefore, we conclude that the sanctions imposed by the trial court under Rule 215 and under its inherent power lacked a direct relationship with the State's sanctionable conduct. *See Thompson*, 901 S.W.2d at 940 (holding trial court abused its discretion in assessing unjust discovery sanction which was not directed at the allegedly sanctionable conduct and remedying the prejudice caused by that conduct); *Arkla, Inc.*, 846 S.W.2d at 628 (holding trial court abused its discretion in assessing unjust sanction of early trial setting based on discovery abuse by one defendant relating to document production, given that sanction did not directly relate to the misconduct and that it prejudiced other defendants who had not engaged in misconduct).

---

24. The trial court made handwritten modifications to this proposed judgment before signing it, but these modifications are not relevant here.

25. PR Investments asserts it is entitled to significantly more damages under the Corder Plan than under the Sparks Plan. On remand, the Property Owners are free to assert their arguments regarding their damages under the Corder Plan.

The trial court stated that no lesser sanction was available; however, the trial court did not explain why it could not have imposed the lesser sanction suggested by the State—ordering the State to pay the increase in expenses caused by the switch from the Sparks Plan to the Corder Plan. On this record, we also conclude the sanctions imposed by the trial court were excessive. *See Fethkenher v. Kroger Co.,* 139 S.W.3d 24, 34–37 (Tex.App.-Fort Worth 2004, no pet.) (holding that discovery sanctions under Rule 215 were excessive); *In re Supportkids, Inc.,* 124 S.W.3d 804, 807–08 (Tex.App.-Houston [1st Dist.] 2003, orig. proceeding) (holding that discovery sanctions were excessive).

Accordingly, we conclude the trial court abused its discretion because its sanctions under either Rule 215 or its inherent power to sanction were unjust and excessive.

### III. CONCLUSION

The trial court did not lose jurisdiction over this condemnation proceeding because the State decided shortly before trial to build the Project based on the Corder Plan rather than the Sparks Plan. Because the State brought this condemnation proceeding properly, the trial court erred in dismissing this proceeding and awarding attorney's fees and expenses under section 21.0195 of the Texas Property Code. The trial court abused its discretion by finding a violation and assessing sanctions under

Rule 13 and the Frivolous Claims Act. Although the State may have engaged in conduct warranting discovery sanctions, the sanctions actually assessed by the trial court were unjust and excessive. Therefore, the trial court abused its discretion in assessing the sanctions in question under Rule 215 and under its inherent power. Because the trial court's errors resulted in the erroneous dismissal of the State's condemnation action and the award of unjust and excessive sanctions, these errors probably caused the rendition of an improper judgment. Accordingly, we sustain the State's appellate issues, reverse the trial court's judgment, and remand for further proceedings consistent with this opinion, including but not limited to the trial court's consideration of what amount of monetary sanctions against the State would be just and not excessive.[26]

Justices YATES, HUDSON, FOWLER, and GUZMAN join the Majority Opinion; Chief Justice HEDGES and Justices EDELMAN and SEYMORE join the Dissenting Opinion.

ANDERSON, J., dissenting.

JOHN S. ANDERSON, Justice, dissenting en banc opinion.

I respectfully dissent from the en banc court's disposition of the case. I do so for the reasons set forth below, as well as those in the original panel opinion.[1]

---

**26.** Our dissenting colleagues conclude that the amount of increased expenses, including attorney's fees and expert fees, caused by the switch from the Sparks Plan to the Corder Plan equals the total amount of the Property Owners' expenses—more than $650,000. Sections 21.019 and 21.0195 of the Property Code do not provide a cognizable basis for equating these two items because neither of these sections applies here. The trial court never inquired into the amount by which the Property Owners' expenses would be increased by the switch from the Sparks Plan to

the Corder Plan; rather, the trial court simply found the total amount of the Property Owners' expenses for the entire case under section 21.0195(c). It would not be appropriate for this court to make factual findings, especially regarding sanctions that the trial court has not yet assessed but may assess in the future. Furthermore, we cannot presume that the change in plans rendered useless all of the work performed by the Property Owners' attorneys and experts before December 1, 1999.

**1.** *State v. PR Invs.,* 132 S.W.3d 55 (Tex.App.-Houston [14th Dist.] 2004, pet. filed).

From at least February 1998 through the commissioners' hearing in May 1998, and again in March 1999, the State assured the property owners that construction in the condemned property would proceed according to the Sparks plan.[2] The calculation of damages involves considering the nature of what the condemnor intends to build and the use to which it intends to put the land. *City of Houston v. Precast Structures, Inc.*, 60 S.W.3d 331, 336 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). To calculate damages, the special commissioners heard evidence regarding the Sparks plan. In preparing for the special commissioners' hearing and trial, the property owners necessarily expended time and resources analyzing the effects of the Sparks plan on access and damages to their remainder property. On the eve of trial, the State notified PR Investments—but not Specialty Retailers—it intended to proceed under the Corder plan.

Today, the majority holds, *inter alia*, that the trial court erred when it concluded (1) the change in plans by the State deprived the court of "jurisdiction" over the trial de novo; (2) the change meant the State did not bring the condemnation proceeding properly under Texas Property Code section 21.0195(c), thus justifying an award of attorney's fees and expenses to the property owners; and (3) the trial court could properly dismiss the condemnation action, without prejudice. Majority op. at 652. In reversing the trial court's judgment, the majority is, in effect, replacing trial de novo with trial by ambush in condemnation proceedings.

By blurring the distinction between the trial court's subject matter jurisdiction and the trial court's appellate jurisdiction—or

its power to proceed—in eminent domain cases, the majority is able to permit the trial court to proceed to trial de novo despite a substantial and prejudicial departure from the damages issues presented to the special commissioners. Indeed, the majority faults the dissent for making this distinction. *Id.* at 664 n. 8. Such a distinction, however, is consistent with the manner in which courts have characterized eminent domain proceedings.

Appellate courts have consistently stated the trial court acquires subject matter jurisdiction over the eminent domain proceeding when the condemnor files a legally sufficient petition in condemnation. *See State v. Nelson*, 160 Tex. 515, 334 S.W.2d 788, 790 (1960) (stating filing of written statement for condemnation is initiatory step in proceeding, and it is by virtue of this step jurisdiction of subject matter is acquired); *see also Lin v. Houston Cmty. Coll. Sys.*, 948 S.W.2d 328, 332 (Tex.App.-Amarillo 1997, writ denied) (stating it is well established that jurisdiction of condemnation proceeding does not attach unless condemnation petition includes legally sufficient description of property sought to be condemned and citing *Nelson*, 334 S.W.2d at 790); *Aquila Southwest Pipeline Corp. v. Gupton*, 886 S.W.2d 497, 501 (Tex.App.-Houston [1st Dist.] 1994, no writ) (stating, by virtue of filing petition which reflects statutory requirements, jurisdiction over the subject matter is acquired, and citing *Nelson*, 334 S.W.2d at 790); *Seiler v. Intrastate Gathering Corp.*, 730 S.W.2d 133, 137 (Tex.App.-San Antonio 1987, no writ) (same), *overruled on other grounds by Schumann v. City of Schertz*, 100 S.W.3d 361, 367 (Tex.App.-San Antonio 2002, no pet.).

---

**2.** This is the same plan to which the panel referred as the "Sparks and Barlow plan."

*See PR Invs.*, 132 S.W.3d at 57 n. 2.

Appellate courts have also consistently stated eminent domain proceedings remain administrative in nature until a party files an objection to the special commissioners' award; and the trial court does not acquire the power to adjudicate until the proceeding reaches that point. *See John v. State*, 826 S.W.2d 138, 141 n. 5 (Tex. 1992) (stating, if no party timely files objections, the trial court can perform only its ministerial function and render judgment based upon the commissioner's award); *see also Hubenak v. San Jacinto Gas Transmission Co.*, 141 S.W.3d 172, 179 (Tex.2004) (describing period from filing of condemnation petition until filing of any objections to commissioners' findings as an "administrative proceeding" that converts into a "normal pending cause" when party files objections to commissioners' findings). Moreover, the power the trial court has in the adjudicatory phase is not the same as the power of a court of original jurisdiction. *See Nelson*, 334 S.W.2d at 791 (stating to hold county court on appeal has all the power of a court of original jurisdiction would tend to thwart Legislature's purpose in providing for the administrative hearing).

Given the special nature of eminent domain proceedings, it is therefore legitimate to distinguish between "subject matter jurisdiction" and the "power" of the trial court in relation to the subject matter before it. Such a distinction also has implications for whether the defect in the court's exercise of its power is waivable and whether the defect at issue implicates the finality of a court's action.[3] Subject matter jurisdiction, once properly acquired by the county court, may not be divested. *See Dallas I.S.D. v. Porter*, 709 S.W.2d 642, 643 (Tex.1986). The power to proceed, however, is a separate issue.

In reaching its conclusion the State's change of plans did not deprive the trial court of "jurisdiction," the majority cites six cases. Majority op. at 666–67.[4] Four of the cited cases involve defects in the appointment or service of the special commissioners. In *Pinnacle Gas Treating, Inc. v. Read,* a judge other than the one to whom the condemnation was assigned appointed the special commissioners, and the supreme court stated any error was "curable" by trial de novo. 160 S.W.3d 564, 567 (Tex.2005). In *Fort Worth & Denver Northern Railway. Co. v. Johnson,* the

**3.** In support of its contention "subject matter jurisdiction," "jurisdiction," "appellate jurisdiction," and "power to act," are interchangeable terms, lack of any of which implicates finality, the majority cites *University of Texas Southwestern Medical Center at Dallas v. Loutzenhiser*, 140 S.W.3d 351, 358–59 (Tex. 2004). Majority op. at 664 n. 8. *Loutzenhiser* was not an eminent domain case. It is also clear from the context the *Loutzenhiser* court was analyzing whether a statutory requirement implicated subject matter jurisdiction concerns. *See id.* at 358–59. The court wrote, "The failure of a jurisdictional requirement deprives the court of the power to act *... and ever to have acted,* as a matter of law." *Id.* at 359 (emphasis added). The converse (*i.e.,* that lack of power to act results in a loss of subject matter jurisdiction), however, does not necessarily follow.

**4.** Throughout its opinion, the majority also refers to *Hubenak v. San Jacinto Gas Transmission Co.,* 141 S.W.3d 172 (Tex.2004). *Hubenak* involved an alleged defect related to the statutory requirement that the condemnation petition state that the condemning entity and the property owner were unable to agree on damages. *See id.* at 174, 176 (citing Tex. Prop.Code Ann. § 21.012 (Vernon 2004)). Unlike *Hubenak,* the present case does not involve a defect in the petition, but a defect in the substance of what was before the commissioners as compared to that before the trial court, a defect which occurred when the administrative phase of the condemnation converted into the judicial phase and which implicates the trial court's power to proceed, not its subject matter jurisdiction. *Hubenak* is inapposite.

supreme court observed that, if erroneous, the appointment of commissioners when parties had agreed on other commissioners was not sufficient to invalidate the whole proceeding because the property owners had a full opportunity to contest commissioners' award. 125 Tex. 634, 84 S.W.2d 232, 234 (1935). In *Gulf, Colorado & Santa Fe Railway Co. v. Ft. Worth & Rio Grande Railway Co.*, the property owner objected that the appointed commissioners were not disinterested because they were partially responsible for any condemnation damages; and the supreme court stated the property owner could have secured ample protection by filing objections to the award and obtaining trial de novo before the county court with the right of appeal to the court of appeals. 86 Tex. 537, 26 S.W. 54, 60 (1894). In *City of Houston v. Stovall*, the trial court granted the landowners' motion to dismiss, which was based on the fact only two commissioners participated in making the award; and, in reversing, the court of appeals relied on supreme court precedent upholding the validity of an award joined by only two of three commissioners. 249 S.W.2d 246, 247–48 (Tex. Civ.App.-Galveston 1952, writ ref'd n.r.e.).

Only two of the cases even arguably concern matters touching on the content of what was before the special commissioners. *Blasingame v. Krueger* was a mandamus action in which the property owners challenged an order quashing their subpoenas for witnesses at the commissioners' hearing. 800 S.W.2d 391, 394 (Tex.App.-Houston [14th Dist.] 1990, orig. proceed-

ing). This court stated simply that the parties, who would have a chance to conduct regular discovery during the proceeding in county court, had an adequate remedy a law. *Id.*

In *City of Houston v. Bankers Mortgage Co.*, the only "evidence" the City offered before the special commissioners was the City's letter to the property owner containing its offer for the property. 514 S.W.2d 326, 327 (Tex.Civ.App.-Houston [1st Dist.] 1974, writ ref'd n.r.e.). In responding to the property owner/appellee's argument that the lack of evidence was jurisdictional, the court of appeals concluded the burden to produce evidence was on the landowner, and also stated, "The failure of the Commissioners to hear evidence is not a jurisdictional defect." *Id.* at 328.

The majority's cases are not helpful in deciding the present case for three reasons. First, even if the courts were holding the defect at issue did not implicate "subject matter" jurisdiction, the opinions do not address the question in the present case, which is the extent to which the trial court's adjudicatory power may or may not be limited to the damages issues before the special commissioners. The supreme court has, at a minimum, acknowledged that the trial court does not have unlimited power in eminent domain proceedings. *See Nelson*, 334 S.W.2d at 791.[5] Rather, a trial court in an eminent domain proceeding lacks the power to enlarge the subject matter of the cause and is limited to a review of those damages issues the special commissioners considered. *See Bd. of Re-*

---

**5.** The majority contends the statements in *Nelson* on which the dissenters rely are obiter dicta. Majority op. at 667. In *Nelson*, however, the supreme court was delineating the eminent domain jurisdiction of the county court. *See State v. Nelson*, 160 Tex. 515, 334 S.W.2d 788, 790–91 (1960). When the supreme court makes a statement very deliberately after mature consideration and for future guidance in the conduct of litigation, that statement is judicial, not obiter, dictum and is " 'at least persuasive and should be followed unless found to be erroneous.' " *Edwards v. Kaye*, 9 S.W.3d 310, 314 (Tex.App.-Houston [14th Dist.] 1999, pet. denied) (quoting *Palestine Contractors, Inc. v. Perkins*, 386 S.W.2d 764, 773 (Tex.1964)).

*gents of the Univ. of Tex. Sys. v. Puett*, 519 S.W.2d 667, 670–71 (Tex.Civ.App.-Austin 1975, writ ref'd n.r.e.).[6] The State conceded as much in its initial brief in this court. *See State v. PR Invs.*, 132 S.W.3d 55, 64 (Tex.App.-Houston [14th Dist.] 2004, pet. filed) (discussing the State's concession).

Second, none of the cited cases involve a situation in which the condemnor made substantial and prejudicial changes to its condemnation plans after presenting those plans to the special commissioners. *Blasingame* and *Bankers Mortgage Co.*—the only cases involving defects even arguably related to substance rather than form—concerned only the preclusion and lack of evidence, respectively. *Blasingame* and *Bankers Mortgage Co.* did not address the extent to which the condemning authority may, during the trial de novo, deviate from the damages issues and evidence before the special commissioners. The majority in the present case also does not address whether the condemnor may make unlimited changes to the damages issues and

evidence it presents to the special commissioners. Because the majority has wholly failed to define the scope of the changes the condemnor may make to the damages issues upon trial de novo, bench and bar are left guessing about the legitimate scope of the trial de novo.

Third, to the extent these cases rest on the premise the defect at issue was "curable" by the trial de novo, the majority does not explain how the property owners' expenditure of resources analyzing the abandoned plans would be curable by the trial de novo in the present case. The majority refers to the State's admission—to the trial court and to this court—that it would be appropriate for the trial court to order the State to pay for the increased expenses, including attorney's fees and expert fees, caused by the switch from the Sparks to the Corder plan. Majority op. at 675, 676.

I would conclude the attorney's fees and expenses (including expert expenses) spent analyzing and litigating the abandoned plan constitute "the increased attorney's fees and expenses caused by the switch from the Sparks Plan to the Corder Plan."[7] Based on the uncontroverted testi-

---

**6.** The majority contends the Austin Court of Appeals incorrectly stated that the trial de novo is limited to issues involved in the administrative proceeding before the special commissioners. Majority op. at 668 (citing *Bd. of Regents of the Univ. of Tex. Sys. v. Puett*, 519 S.W.2d 667, 670–71 (Tex.Civ.App.-Austin 1975, writ ref'd n.r.e.)). The majority then observes the trial court has the power to determine the condemnor's right to condemn, whereas the commissioners are limited to findings on compensation. *Id.* It is clear from the context of the *Puett* opinion that the Austin court was referring to "matters as were **properly** before the commissioners." *Puett*, 519 S.W.2d at 671 (emphasis added).

**7.** I reach this conclusion in the present case because the record reflects the Sparks Plan was the focus of the condemnation proceeding virtually from its inception. This conclu-

sion is also consistent with what a condemnee is to be awarded under Texas Property Code section 21.0195, if "a court dismisses a condemnation proceeding on the motion of the [Texas Department of Transportation] or as a result of the failure of the department to bring the proceeding properly." TEX. PROP.CODE ANN. § 21.0195(c) (Vernon Supp.2004); *see also Board of Regents of the Univ. of Houston Sys. v. FKM Partnership, Ltd.*, 178 S.W.3d 1, 7 (Tex.App.-Houston [14th Dist.] 2005, no pet. h.) (stating, under Texas Property Code section 21.019, landowner's damages include reasonable and necessary fees for attorneys, appraisers, photographers, and for the other expenses incurred by property owner). In *FKM Partnership, Ltd.*, this court remanded for a hearing on the damages related to the portion of land the condemning authority sought to dismiss. *Id.* at 7.

mony, the trial court awarded an amount reflecting those fees and expenses.[8]

Having reversed the trial court's judgment, the majority does not explain how the property owners are to recoup the fees and expenses incurred in analyzing and litigating the abandoned plan. The majority, instead, suggests some lesser amount would be appropriate and apparently ties award of that amount only to the discovery abuse, not to the substantial change from the plans presented to the special commissioners.

In sum, the net effect of the majority's decision is to allow the condemning authority to completely subvert the administrative phase of an eminent domain proceeding. Unlike a purely procedural defect, such as the appointment of commissioners in *Read*, releasing the condemnor from a need to present the commissioners with evidence of what the condemnor actually intends to construct does indeed render the administrative proceeding irrelevant. *Cf. Read*, 160 S.W.3d at 567 n. 4 (rejecting property owner's argument that to say error is curable by trial de novo renders administrative condemnation irrelevant; instead reasoning, when parties are satisfied with administrative proceeding, they may forgo right to trial, saving money and expense).

The condemning authority now has virtually no incentive to present the special commissioners with evidence of the nature of what it actually intends to build or the use to which it intends to put the land. *See Precast Structures, Inc.*, 60 S.W.3d at 336. As the State's attorney presciently observed in this case, "That's what's weird about these [eminent domain] cases ... essentially one party in litigation can change the facts."

In short, the majority has, in essence, endorsed trial by ambush in the eminent domain arena. For the preceding reasons and those set forth in the original panel opinion, I respectfully dissent from the decisions to grant en banc rehearing and to reverse the judgment of the trial court.

---

8. With the exception of credits if the case were not appealed, the trial court's award of fees and expenses reflects the property owners' uncontroverted testimony. The trial court, however, gave the State a greater credit against the fees awarded to PR Investments than the testimony supported if the case were not appealed.