**Memorandum Opinion Dated February 25, 2016 Withdrawn, Petition for Writ of Mandamus Conditionally Granted, in Part, and Denied, in Part, and Memorandum Opinion filed June 9, 2016.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-15-00789-CV

---

## IN RE RH WHITE OAK, LLC, BRIAN HARDY, COLIN ZAK, ENTEX PARTNERS, LTD., AND ENTEX MANAGEMENT SERVICES, L.L.C., Relators

---

**ORIGINAL PROCEEDING**
**WRIT OF MANDAMUS**
**125th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2010-81470**

---

## MEMORANDUM OPINION ON REHEARING[1]

This is the second time these parties have been before this court on a discovery

sanctions order. Relators, RH White Oak, LLC, Brian Hardy, Colin Zak, Entex Partners,

---

[1] We issued our original opinion on February 25, 2016. Relators filed a motion for rehearing. We overrule the motion for rehearing, withdraw our prior opinion issued on February 25, 2016, issue this opinion on rehearing, and deny the motion for rehearing en banc as moot.

Ltd., and Entex Management Services, L.L.C., previously sought mandamus relief for the October 25, 2013 sanctions order signed by the Honorable Kyle Carter, presiding judge of the 125th District Court of Harris County. *See In re RH White Oak, LLC*, 442 S.W.3d 492 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding) ("*RH White Oak I*"). We conditionally granted the petition, in part, as to evidentiary sanctions and denied it, in part, as to monetary sanctions. *Id.* at 504.

On August 10, 2015, Judge Carter signed an order reforming the first sanctions order. Relators bring the current petition for writ of mandamus to compel Judge Carter to set aside his August 10, 2015 order reforming the October 25, 2013 order granting sanctions for discovery abuse. We conditionally grant the petition, in part, and deny it, in part.

## I. BACKGROUND

On September 30, 2008, relators executed a note and other related documents for a construction loan from real party in interest Lone Star Bank. On October 6, 2008, a letter, purportedly signed by Colin Zak and Brian Hardy, was presented to a Lone Star loan officer, real party in interest Rick Hajdik, authorizing J.R. Reuther of Reuther Homes, LLC to make draws on behalf RH White Oak. The October 6, 2008 letter states:

> Please accept this letter as my authorization to allow JR Reuther of Reuther Homes to make draw requests on behalf of RH White Oak, LLC for the construction/development of the aforementioned project. This shall pertain to both construction and soft cost draw requests.
>
> It is my understanding that draws are paid per the Bank mandated Draw Schedule upon completion of each construction phase.

2

I also authorize for all draws approved by the bank inspector to be funded into the bank account of Reuther Homes.

I further understand that Lone Star Bank will require lien waivers/affidavits of bill paid once each draw has been funded.

Relators defaulted on the note, and a non-judicial foreclosure sale was held on January 4, 2011. Lone Star sued relators for the remaining balance of the note, interest, and attorney's fees.

Relators filed counterclaims against Lone Star for fraud in a real estate transaction, common law fraud, DTPA violations, breach of contract, constructive trust, equitable lien, declaratory judgment, and attorney's fees. Relators alleged Reuther's withdrawals were unauthorized because Zak's and Hardy's signatures on the October 6, 2008 letter presented to Lone Star had been forged. Relators also filed a third-party petition against Rick Hajdik, alleging claims for fraud in a real estate transaction, common law fraud, breach of fiduciary duty, conspiracy, and attorney's fees. Lone Star and Hajdik subsequently obtained a copy of the October 6, 2008 letter with Zak's and Hardy's genuine signatures from Reuther in response to a subpoena.

The trial court signed a twenty-three-page sanctions order on October 25, 2013, finding that relators had the October 6, 2008 letter with genuine signature in their possession, but deliberately failed to produce it. Pursuant to the order, relators were prohibited from introducing any contrary evidence, conducting further discovery, filing further pleadings, and introducing evidence of their claims and defenses against Lone Star and Hajdik. The trial court also awarded Lone Star and Hajdik attorney's fees and monetary sanctions.

Relators filed an original proceeding in this court. We held that there was no direct relationship between relators' failure to produce the October 6, 2008 letter with their genuine signature and foreclosing their claims and defenses. *Id.* at 502−03. Subsequent to our opinion, Lone Star and Hajdik and relators filed their respective motions to reform the October 25, 2013 order. The trial court held a hearing and signed the reformed sanctions order on August 10, 2015.

The new forty-six-page sanctions order is now based on "Concealed Documents," which relators did not produce, consisting of not only the October 6, 2008 letter with the genuine signatures but also a wire transfer agreement with genuine signatures, a wire transfer form with genuine signatures, and emails concerning the authorization of Reuther to make draws. The order makes thirty-five fact findings that are established as a matter of law for purposes of this suit and prohibits relators from introducing any evidence to the contrary to inoculate the jury regarding those facts. The order further reassesses the same monetary sanctions as in the October 25, 2013 order.

In this original proceeding, relators assert that the August 10, 2015 order suffers from many of the same deficiencies as the October 25, 2013 order.

## II. MANDAMUS STANDARD OF REVIEW

To be entitled to mandamus relief, a relator must demonstrate (1) the trial court clearly abused its discretion; and (2) the relator has no adequate remedy by appeal. *In re Reece*, 341 S.W.3d 360, 364 (Tex. 2011) (orig. proceeding). A trial court clearly abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law or if it clearly fails to analyze the law correctly or

4

apply the law correctly to the facts. *In re Cerberus Capital Mgmt. L.P.*, 164 S.W.3d 379, 382 (Tex. 2005) (orig. proceeding) (per curiam).

The adequacy of an appellate remedy must be determined by balancing the benefits of mandamus review against the detriments. *In re Team Rocket, L.P.*, 256 S.W.3d 257, 262 (Tex. 2008) (orig. proceeding). Because this balance depends heavily on circumstances, it must be guided by analysis of principles rather than simple rules that treat cases as categories. *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 464 (Tex. 2008) (orig. proceeding). In evaluating benefits and detriments, we consider whether mandamus will preserve important substantive and procedural rights from impairment or loss. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 136 (Tex. 2004) (orig. proceeding). We also consider whether mandamus will "allow the appellate courts to give needed and helpful direction to the law that would otherwise prove elusive in appeals from final judgments." *Id.* Finally, we consider whether mandamus will spare the litigants and the public "the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings." *Id.*

## III. ANALYSIS

### A. Abuse of Discretion

Relators contend that the sanctions are not "just." Discovery sanctions serve three purposes: (1) to secure the parties' compliance with the discovery rules; (2) to deter other litigants from violating the discovery rules; and (3) to punish parties who violate the discovery rules. *Spohn Hosp. v. Mayer*, 104 S.W.3d 878, 882 (Tex. 2003) (per curiam). Any sanction must be "just"; that is: (1) a direct relationship must exist between the offensive conduct and sanction imposed; and (2) a sanction must not be

excessive. *TransAmerican Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991) (orig. proceeding).

## 1. Direct Relationship

Under the first prong, a direct relationship exists if a trial court directs the sanction against the abuse found and it remedies the prejudice caused to the innocent party. *Id.* The trial court found a direct nexus between the evidentiary sanctions and relators' perjury and misconduct regarding the (1) failure to produce the Concealed Documents; (2) existence of the Concealed Documents; (3) signing of the Concealed Documents; and (4) circumstances surrounding the signing of the documents.

Relators contend that the order fails the direct relationship test because it is not directed against the abuse or toward remedying the purported prejudice caused by the discovery abuse. Relators complain that the additional findings go beyond their claims that the signatures on the subject documents are forgeries. Lone Star and Hajdik respond that the evidentiary findings are just because they are derived directly from the Concealed Documents, which correct the record in the trial court. We consider these arguments in addressing whether there is a direct relationship between the thirty-five fact findings and the misconduct found by the trial court.

**Findings i−v:** These findings establish that Zak and Hardy signed the October 6, 2008 letter and other documents authorizing Reuther to make draw requests and deposit the funds into Reuther Homes' bank account. We conclude that these findings have a direct relationship to the discovery abuse because the Concealed Documents, which authorized Reuther to make the subject draw requests and deposit the funds into Reuther

6

Homes' account, contained Zak's and Hardy's genuine signatures and the emails between them and Reuther show they returned the signed documents to him.[2]

**Findings vi−ix:** These findings establish that, six days after the loan closed, Zak, in his individual capacity and as sole managing member of RH White Oak, and Hardy, in his individual capacity, appointed Reuther agent and authorized him to make draws on the loan. We conclude that these findings have a direct relationship to the discovery abuse because the concealed October 6, 2008 letter states the capacity in which Zak and Hardy signed the letter. Although relators argue that the findings improperly declare Reuther an agent irrespective of the limitations in the letter, we see nothing in the findings that would alter the scope of the agency as defined in the letter. Moreover, even though the Concealed Documents do not establish that the loan closed on September 30, 2008, the closing date of the loan is not disputed.

**Finding x:** This finding establishes that relators authorized Lone Star and Hajdik to fund Reuther's draw requests and deposit the funds into Reuther Homes' account. We conclude that this finding has a direct relationship to the discovery abuse because the concealed October 6, 2008 letter gave Reuther authority to make draw requests and deposit those funds into Reuther Homes' account.

**Finding xi:** This finding establishes that Hardy knew Lone Star required his personal guaranty. A June 1, 2008 email from Reuther to Zak and Hardy, discussing the White Oak project, stated "Both of the deals do not require any cash out of pocket to close on the deal — we will get 100% financing from the banks on these (except White

---

[2] Relators do not challenge these findings in this proceeding.

Oak that will have the land equity in the deal). I only need your additional guarantees." We conclude that there is a direct relationship between the finding and the discovery abuse because it is taken from the concealed email.

**Findings xii and xiii:** These findings establish that relators authorized Reuther to make draw requests for construction, development, and soft costs. We conclude that this finding has a direct relationship to the discovery abuse because the concealed October 6, 2008 letter gave Reuther authority to make draw requests for construction, development, and soft costs.

**Finding xiv:** This finding establishes that relators authorized that draws be deposited into Reuther Homes' bank account. We conclude that there is a direct relationship between the finding and the discovery abuse because the concealed October 6, 2008 letter authorized "all draws approved by the bank inspector to be funded into the bank account of Reuther Homes."

**Findings xv–xviii:** These findings establish that the October 6, 2008 letter does not require Lone Star to pay draws pursuant to the bank's mandated draw schedule, limit Reuther's authority to draws paid pursuant to the bank's mandated draw schedule, or obligate Lone Star to obtain lien waivers or affidavits of bills paid. Although labeled as findings, these portions of the order are legal interpretations of the October 6, 2008 letter. We conclude that there is no direct relationship between these findings and the discovery abuse because they are not consistent with the October 6, 2008 letter, which provides it was Zak's and Hardy's understanding that (1) "draws are paid per the Bank mandated Draw Schedule upon completion of each construction phase"; and (2) "Lone

8

Star Bank will require lien waivers / affidavits of bill paid once each draw has been funded."

**Finding xix:** This finding establishes that relators informed Reuther, in an email on December 2, 2008, of their desire to place the project on hold and requested that he advise them of all costs associated with the project and redraft the letter to the bank, which he "had [them] sign allowing draws to be paid into the Reuther Homes account." Because this finding is taken directly from the concealed email, we conclude that there is a direct relationship between it and the discovery abuse.[3]

**Findings xx and xxi:** These findings establish that Zak signed a blank Lone Star wire transfer agreement and request form with full knowledge that Reuther would fill in the blanks. We conclude that there is a direct relationship between these findings and the discovery abuse because one of the concealed emails shows that Reuther asked Zak, on October 6, 2008, to sign the wire transfer agreement and form and to "send back the signature pages for both and I will fill in the rest."

**Findings xxii and xxiii:** These findings establish that Zak signed the wire transfer agreement and request form with full knowledge and expectation that Reuther would use it. We conclude that these findings regarding Zak's full knowledge and expectation have no direct relationship to the discovery abuse because the concealed email does not address Zak's expectations.

**Finding xxiv:** This finding establishes that Lone Star did not fund any draws to Reuther until after October 6, 2008. The Concealed Documents do not establish the

---

[3] Relators do not challenge this finding in this proceeding.

time of the first funded draw request.  However, because this fact is not in dispute, we conclude that there is no abuse of discretion.

**Finding xxv:** This finding establishes that Reuther was relators' "authorized representative" to initiate wire transfers of funds from the loan.  We conclude that there is a direct relationship between this finding and the discovery abuse because the October 6, 2008 letter authorized Reuther to make draw requests and the signed blank wire transfer agreement provides for the designation of an "authorized representative."

**Findings xxvi−xxviii:** These findings establish that, pursuant to the wire transfer agreement, relators were responsible for the accuracy of the wire transfer instructions provided by the customer's authorized representative and would not request a wire transfer that violated federal or state law.  Because these findings are taken directly from the wire transfer agreement, the genuine version of which was concealed, we conclude that there is a direct relationship to the discovery abuse.

**Finding xxix:** This finding establishes that relators had the opportunity to limit Reuther's authority and ability to effectuate wire transfers but did not do so; instead, they chose to sign a blank wire transfer agreement and give it to Reuther.  We conclude that there is no direct relationship between this finding and the discovery abuse because it goes beyond the information contained the wire transfer agreement and the other Concealed Documents.

**Findings xxx and xxxi:** These findings quote the wire transfer agreement regarding the relators' responsibility to verify executed transactions on statements and to provide notice of erroneous or unauthorized transactions to Lone Star to mitigate damages and the circumstances under which Lone Star has no liability.  Because these

10

findings are taken directly from the wire transfer agreement, the genuine version of which was concealed, we conclude that they are directly related to the discovery abuse.

**Finding xxxii:** This finding establishes that relators did not communicate with Lone Star or Hajdik until January 20, 2009. We conclude that there is a direct relationship between this finding and the discovery abuse because a concealed January 20, 2009 email from Hardy to Reuther shows that there had been no communication with Lone Star and Hajdik up to that date.

**Finding xxxiii:** This finding establishes that relators did not report errors to Lone Star within sixty days of any draw Lone Star wired to Reuther. We conclude that there is no direct relationship between this finding and the discovery abuse because it is not addressed in the Concealed Documents.

**Finding xxxiv:** This finding establishes that relators or Lone Star could terminate the wire transfer agreement upon ten days' written notice. Because this finding is taken from the wire transfer agreement, the genuine version of which was concealed, we conclude that it has a direct relationship to the abuse.

**Finding xxxv:** This finding establishes that all signatures on the Concealed Documents, including letters authorizing Reuther to make draws on behalf of RH White Oak, are genuine, not forged. We conclude that a direct relationship exists between this finding and the discovery abuse because relators denied the existence of the Concealed Documents with the genuine signatures.

In summary, we hold that findings i–xiv, xix–xxi, xxiv–xxviii, xxx, xxxi, xxxii, xxxiv, and xxxv have a direct relationship to the discovery abuse. The remaining

findings, xv−xviii, xxii, xxiii, xxix, and xxxiii, have no direct relationship to the discovery abuse.

## 2. Excessive Sanctions

Under the second prong, just sanctions must not be excessive. *TransAmerican Nat. Gas Corp.*, 811 S.W.2d at 917. The discovery sanction imposed should be no more severe than necessary to serve its legitimate purposes. *Id.* A sanction is excessive if lesser sanctions would have served the purposes of compliance, deterrence, and punishment. *5 Star Diamond, LLC v. Singh*, 369 S.W.3d 572, 579 (Tex. App.—Dallas 2012, no pet.). Generally, before a sanction that prevents a decision on the merits is justified, lesser sanctions must first be tested to determine their efficacy. *Cire v. Cummings*, 134 S.W.3d 835, 840 (Tex. 2004).

We assume, without deciding, that the findings imposed as sanctions are death penalty sanctions. In all but the most exceptional cases, the trial court must actually test the lesser sanctions before imposing death penalty sanctions. *See id.* at 842 ("[I]n all but the most exceptional cases, the trial court must actually test the lesser sanctions before striking the pleadings.") In all cases, the record must reflect that the trial court considered the availability of appropriate lesser sanctions and must contain an explanation of the appropriateness of the sanction imposed. *Id.* "[T]he trial court need not test the effectiveness of each available lesser sanction by actually imposing the lesser sanction on the party before issuing the death penalty; rather, the trial court must analyze the available sanctions and offer a reasoned explanation as to the appropriateness of the sanction imposed." *Id.* at 840. The trial court is not required "to list each possible lesser sanction in its order and then explain why each would be

ineffective." *Id.* at 842; *see also id.* (disagreeing with the court of appeals' holding that the death penalty sanctions order was insufficient because the trial court was required to address each of the lesser sanctions available and explain why they would not be effective).

Relators contend that the trial court's explanation in the sanctions order for why it did not impose lesser sanctions is merely unsupported ipse dixit. The trial court explained in the August 10, 2015 order that it considered lesser sanctions but rejected them:

> The Court further finds that Defendants' perjury and misconduct to be so egregious and so abusive so as to constitute an exceptional case, justifying severe sanctions; . . . though all possible lesser sanctions have been considered by the Court, no lesser sanctions will properly and fully punish Defendants' perjury and misconduct while concomitantly addressing Defendants' perjury, false claims and allegations which permeate the record in this case.

Considering the above statement and the entire order, we hold that the trial court offered a reasoned explanation for not imposing lesser sanctions. *Cf. GTE Commc'ns Sys. Corp. v. Tanner*, 856 S.W.2d 725, 729 (Tex. 1993) (orig. proceeding) (giving no deference to unsupported conclusions in the trial court's order, which stated without explanation that lesser sanctions would have been ineffective); *Associated Air Ctr. LP v. Tary Network Ltd.*, No. 05-13-00685-CV, 2015 WL 970664, at \*6 (Tex. App.—Dallas Mar. 4, 2015, no pet.) (mem. op.) ("[T]he sanctions order simply recites, without any further explanation or analysis, that lesser sanctions were considered but 'would not promote compliance with the Texas Rules of Civil Procedure.' Beyond this general

13

statement and description of the offensive conduct, the trial court in this case offered no reasoned explanation of the appropriateness of the sanctions imposed.").

Turning to whether the sanctions were excessive, we observe that the trial court may not use discovery sanctions to adjudicate the merits of a party's claims unless the party's hindrance of the discovery process justifies a presumption that its claims lack merit. *Cire*, 134 S.W.3d at 841. "Sanctions which are so severe as to preclude presentation of the merits of the case should not be assessed absent a party's flagrant bad faith or counsel's callous disregard for the responsibilities of discovery under the rules." *TransAmerican Natural Gas Corp.*, 811 S.W.2d at 918. Thus, a trial court may abuse its discretion by imposing death penalty sanctions in the first instance when the court has not yet attempted to compel compliance with the discovery rules. *See Associated Air Ctr. LP*, 2015 WL 970664, at *7 (holding that case determinative sanctions were not warranted in the first instance as would be permitted in an "exceptional case" because the record did not show repeated efforts by the trial court to obtain appellants' compliance with their discovery obligations or evidence of repeated violations of court orders); *In re Farmers Tex. Cty. Mut. Ins. Co.*, No. 04-13-00644-CV, 2013 WL 6730094, at *3 (Tex. App.—San Antonio Dec. 20, 2013, orig. proceeding) (mem. op.) (holding that the record did not reflect conduct justifying a presumption that the relator's claims or defenses lacked merit: no party had refused to produce material evidence in the face of lesser sanctions; the trial court had not previously imposed any lesser sanctions in an effort to gain the compliance of a party who refused or objected to producing the statement; and the record did not show that the aggrieved party was unable to prepare for trial as a result of the late production); *In re M.J.M.*, 406 S.W.3d

14

292, 298 (Tex. App.—San Antonio 2013, no pet.) (holding that the record did not support a presumption that claims or defenses lacked merit because it neither contained previous orders sanctioning the father for discovery abuse nor showed that the trial court had attempted to obtain compliance with the discovery rules by imposing a less stringent sanction before imposing death penalty sanctions, and the trial court failed to explain the appropriateness of imposing death penalty sanctions).

On the other hand, in a case involving the fabrication of evidence or the giving of false and misleading testimony, it may not be possible to cure the misconduct with lesser sanctions. For example, the Dallas Court of Appeals agreed with the following discussion from a trial court order imposing death penalty sanctions:

> Defendants' demonstrated willingness to testify falsely and misleadingly, to fabricate claims, defenses and evidence, to present false arguments and evidence to the Court, and to violate the Injunction Order, have completely undermined Defendants' credibility and have permeated and compromised the integrity of this entire proceeding to an extent that cannot be cured through the imposition of lesser sanctions than those imposed herein. Because of the extent and nature of Defendants' fabrication of evidence and intent to deceive the Court and Movants, and the aggressive use of threats, motions and obstructionist tactics by Defendants to conceal their wrongdoing, the Court finds that the sanctions ordered herein are not excessive and that the imposition of lesser sanctions is not appropriate or required.

*Response Time, Inc. v. Sterling Commerce (N. Am.), Inc.*, 95 S.W.3d 656, 662 (Tex. App.—Dallas 2002, no pet.).

Similarly, the Austin Court of Appeals has provided a thorough analysis for the imposition of death penalty sanctions when a party fabricates documents and lies about those documents:

> Producing false documents in discovery and then lying about those documents in deposition undoubtedly qualifies as an abuse—flagrant, in fact—of the discovery process, whose ultimate goal is, after all, a search for the truth. . . . While it may be true that death-penalty sanctions cases in Texas *usually* involve discovery orders under rule 215, the absence of such orders does not necessarily preclude the imposition of death-penalty sanctions where, as here, the objectionable discovery conduct is fabricating evidence and lying about that evidence in deposition. In most discovery disputes, the objectionable conduct is something that can be corrected using a court order—e.g., ordering a party to appear for a deposition, to respond to written discovery, or to produce certain documents. But when a party fabricates evidence and lies about that evidence in deposition, these typical discovery orders would be ineffective in addressing or punishing the objectionable discovery conduct. Courts cannot effectively order someone to take back fabricating the evidence or lying in deposition; nor would it make sense to compel a party to refrain from fabricating evidence or lying in the future when that type of conduct is already prohibited. Likewise, simply excluding the fabricated evidence would be no punishment and, in fact, would fail to address the inherent problem. Accordingly, when the objectionable discovery conduct is fabricating evidence and lying about it in deposition, it is both logical and reasonable that there were no underlying discovery orders. We are not inclined to hold that, as a matter of law, there must be underlying orders that gradually lead up to the death-penalty sanction.

*JNS Enter., Inc. v. Dixie Demolition, LLC*, 430 S.W.3d 444, 453 (Tex. App.—Austin 2013, no pet.) (citations omitted); *see also Daniel v. Kelley Oil Corp.*, 981 S.W.2d 230, 235 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (holding that the fabrication of a tape recording by the plaintiff in a sexual harassment suit warranted death penalty

16

sanctions because (1) the "very act of fabricating evidence strongly suggests that a party has no legitimate evidence to support her claims"; (2) "[m]eritless claims impose a terrible hardship on opponents, and it is unjust to allow such claims to be presented"; and (3) a less stringent sanction such as the exclusion of the audio would not have been effective because it would merely put the plaintiff in the position she would have been had she not manufactured the tape).

Relators complain that the death penalty sanctions are based on the trial court's mere belief that they had falsely denied the existence of the October 6, 2008 letter with genuine signatures and the wire transfer agreement and wire transfer form with genuine signatures. "'[W]hen a motion for sanctions asserts that a respondent to a discovery request has failed to produce a document within its possession, custody or control, the movant has the burden to prove the assertion.'" *Global Servs., Inc. v. Bianchi*, 901 S.W.2d 934, 937 (Tex.1995) (orig. proceeding) (quoting *GTE Commc'ns Sys. Corp.*, 856 S.W.2d at 732). Because direct evidence is rarely available, it may be necessary for the movant rely entirely on circumstantial evidence. *See id.* at 938 ("We recognize that it is often difficult to prove that a party has withheld documents from discovery. Direct evidence of such conduct is seldom available, and it may be necessary to rely entirely upon circumstantial evidence."). The court's imposition of sanctions cannot be based merely on a party's bald assertions, however. *Id.* Instead, "[t]here must be some evidence to show an abuse of discovery before sanctions can be imposed." *Id.*

The trial court found relators had lied and given false testimony about the existence of the documents and lied about signing them, falsely claiming that they were forged. In *RH White Oak I*, we detailed the "circumstantial evidence showing that

17

relators had actually signed a copy of the October 6, 2008 letter but later denied its existence and failed to produce it, which is sufficient to support a finding of sanctionable conduct." 442 S.W.3d at 500 (citing *Bianchi*, 901 S.W.2d at 938). Among other evidence, an email sent from Zak's email account showed that he was sending the signed letter to Reuther. Relators contend that there is also contrary evidence, but any such evidence would merely create a factual dispute. The trial court resolved that dispute with its finding that relators had engaged in false and misleading conduct, and we may not second-guess that resolution in a mandamus proceeding. *See In re Angelini*, 186 S.W.3d 558, 560 (Tex. 2006) (orig. proceeding) ("It is well established Texas law that an appellate court may not deal with disputed areas of fact in an original mandamus proceeding.'" (quoting *Brady v. Fourteenth Court of Appeals*, 795 S.W.2d 712, 714 (Tex. 1990))).

Given its finding of false and misleading conduct, the trial court explained that "no lesser sanctions will properly and fully punish Defendants' perjury and misconduct while concomitantly addressing Defendants' perjury, false claims and allegations which permeate the record in this case." The reasoning in *Response Time*, *JNS Enterprise*, and *Daniel* supports the trial court's conclusion that the sanctions imposed are not excessive. Although those cases involved the fabrication of evidence, they also involved false testimony and concealment of wrong-doing. The trial court cannot effectively order someone to take back lies told under oath; "nor would it make sense to compel a party to refrain from . . . lying in the future when that type of conduct is already prohibited." *JNS Enter., Inc.*, 430 S.W.3d at 453.

18

Relators compare this case with another recent opinion from this court involving death penalty sanctions. *See Primo v. Rothenberg*, Nos. 14-13-00794-CV & 14-13-00997-CV, 2015 WL 3799763 (Tex. App.—Houston [14th Dist.] June 18, 2015, pet. denied) (mem. op.). In that case, Primo repeatedly and intentionally failed to comply with discovery requests. The trial court granted Rothenberg's motion for death penalty sanctions against Primo. *Id.* at *1. This court, not condoning Primo's conduct, held that the trial court abused its discretion by imposing death penalty sanctions in the first instance without considering or testing lesser sanctions for failure to comply with discovery requests. *Id.* at *22. Rothenberg had not cited, and we had not found, any case in which similar conduct warranted death penalty sanctions without first considering or testing lesser sanctions. *Id.* at *23. We concluded the circumstances in *Primo* were more like cases in which death penalty sanctions were inappropriate because lesser sanctions were not first considered or tested; they did not involve the deliberate destruction of dispositive evidence. *Id.* at *24 (citing *Cire*, 134 S.W.3d at 840–42).

The trial court in *Primo* signed a second order reaffirming the first sanctions order and adding findings regarding conduct after the first sanctions order. *Id.* at *23. But, as with the first order, the trial court did not analyze the available sanctions in the second order or offer a reasoned explanation as to the appropriateness of the sanction imposed. *Id.* at *23–24. "Re-hanging an already-hung litigant does not fix procedural flaws preceding the first trip to the gallows and does not comply with *TransAmerican*." *Id.* at *23.

19

This case is different from *Primo*. Here, the trial court explained that this was an exceptional case because of relators' perjury in denying the existence of the signed October 6, 2008 letter and false claims that the letter was forged. As *Response Time*, *JNS Enterprise*, and *Daniel* recognize, this conduct is more like the deliberate destruction of evidence in that lesser sanctions may not cure it. In addition, the trial court explained that it had considered all possible lesser sanctions. The specific language quoted above and the forty-six-page order as a whole sufficiently demonstrate that the trial court offered a reasoned explanation for not imposing lesser sanctions. This is not a case in which the sanction order contained no explanation beyond a general statement that lesser sanctions were considered but would not promote compliance. The trial court was not required "to list each possible lesser sanction in its order and then explain why each would be ineffective." *Cire*, 134 S.W.3d at 842.

Relying on an en banc opinion from this court, relators also contend that death penalty sanctions are excessive in light of the monetary sanctions assessed in the order.[4] *See State v. PR Invs. & Specialty Retailers, Inc.*, 180 S.W.3d 654 (Tex. App.—Houston [14th Dist.] 2005), *aff'd*, 251 S.W.3d 472 (Tex. 2008). Relators did not make this argument in their first mandamus petition challenging the trial court's sanctions order, so we did not address it in our *RH White Oak I* opinion. Nor did relators raise this argument in the subsequent trial court proceedings, which focused on how to reform the trial court's sanctions order to comply with our opinion in *RH White Oak I*.

---

[4] As we explained in *RH White Oak I*, relators have not shown the lack of an adequate remedy by appeal regarding the monetary sanctions, so those sanctions are not reviewable by mandamus. 442 S.W.3d at 504. Thus, we do not know whether or to what extent the monetary sanctions will remain in place following any appeal.

Accordingly, we do not consider relators' argument. *See In re Advance Payroll Funding, Ltd.*, 254 S.W.3d 710, 714 (Tex. App.—Dallas 2008, orig. proceeding) ("Neither of these arguments were presented to the trial court. It is well established that arguments not presented to the trial court will not be considered in a petition for writ of mandamus.").

For these reasons, we hold the sanctions imposed in the August 10, 2015 order that are directly related to the discovery abuse are not excessive.

## B. Inadequate Remedy by Appeal

A party does not have an adequate remedy by appeal when the trial court imposes sanctions that have the effect of adjudicating a dispute but do not result in the rendition of an appealable judgment. *TransAmerican Nat. Gas Corp.*, 811 S.W.2d at 919. Because the trial court's findings adjudicate certain portions of this dispute but there has been no rendition of a final judgment, relators do not have an adequate remedy by appeal.

## IV. CONCLUSION

We hold that (1) the trial court abused its discretion by making the following findings in its August 10, 2015 sanctions order: xv−xviii, xxii, xxiii, xxix, and xxxiii; and (2) relators do not have an adequate remedy by appeal. We therefore conditionally grant relators' petition for writ of mandamus, in part, and order the trial court to vacate those portions of August 10, 2015 sanctions order as to those findings. The writ will issue only if the trial court fails to act in accordance with this opinion. We deny the

remainder of the petition as to findings i−xiv, xix−xxi, xxiv−xxviii, xxx, xxxi, xxxii, xxxiv, and xxxv.

/s/    John Donovan
       Justice

Panel consists of Justices Busby, Donovan, and Wise.